## PARKER RUST PROOF CO. v. FORD MOTOR CO.

(District Court, E. D. Michigan, S. D. March 27, 1925.)

No. 424.

1. **Patents** ⟲⟶328 — 870,937 for rustproofing held to give a practical formula.

Coslett patent No. 870,937, for rustproofing in a dilute solution of ordinary phosphoric acid, *held* to give a practical formula.

2. **Patents** ⟲⟶65—Words of foreign patent, leaving one to experiment, too indefinite for disclosure on which to base anticipation.

Words of a patent, especially a foreign patent, which are so indefinite as to require long experiment to produce the desired result, are insufficient on which to predicate disclosure and anticipation.

3. **Patents** ⟲⟶328—870,937 for rustproofing not anticipated.

Disclosures in the English patents of Ross and Ramsden *held* too indefinite on which to predicate anticipation as against Coslett patent

No. 870,937, for rustproofing by treatment in a dilute solution of ordinary phosphoric acid.

**4. Patents ⊙—160—Scope of claims unaffected by argument in patent office.**

Ill-advised argument of counsel while application is before patent office has no effect on the scope of the claims; the original claims being retained.

**5. Patents ⊙—328—870,937, claims 3, 4, 5, and 6, for rustproofing process and the product, held valid and infringed.**

Coslett patent No. 870,937, claims 3, 4, 5, and 6, for a process of rustproofing by treatment in a dilute solution of ordinary phosphoric acid with or without iron added, and the product produced thereby, *held* pioneer, valid, and infringed.

At Law. Suit by the Parker Rust Proof Company against the Ford Motor Company. Decree for plaintiff.

Alexis C. Angell and Edward N. Pagelsen, both of Detroit, Mich., Burt D. Chandler, of Hudson, Mich., and James H. Cornelius, of Adrian, Mich., for plaintiff.

Barthel, Flanders & Barthel, of Detroit, Mich. (Otto F. Barthel, of Detroit, Mich., of counsel), Homer C. Underwood, of Detroit, Mich., and Walter Clyde Jones and Arthur A. Olson, both of Chicago, Ill., for defendant.

TUTTLE, District Judge. Parker Rust Proof Company brings this suit against Ford Motor Company, alleging the infringement of United States letters patent No. 870,937, granted November 12, 1907, to Thomas Watts Coslett of Birmingham, England, for certain new and useful improvements relating to the treatment of iron or steel for preventing oxidation or rusting.

This patent was assigned to the plaintiff in 1916, and it is shown that the sum of $95,000 was paid for this patent and for another United States patent to the same inventor which covered a modification of the process set forth in the patent in suit, and was dominated by patent No. 870,937.

Iron and steel have been rusting ever since the manufacture thereof was discovered, and the prevention of such rusting is a matter of profound importance. The tests presented to the court by both plaintiff and defendant demonstrate that a commercially workable process is in use and that oxidation or rusting can be substantially prevented. Claims 3, 4, 5, and 6 alone are involved.

The patent states:

"This invention relates to improvements in the kind of treatment of iron or steel for preventing oxidation or 'rusting' in which the iron or steel, or articles composed or having a surface of iron or steel is or are provided with a protective covering adapted to render the surface thereof capable of resisting, or of being unaffected by, the action of moisture and other oxidizing or 'rusting' influences.

"It has heretofore been proposed to treat iron with glacial phosphoric acid and also to treat iron wire with the said acid dissolved in water with the object of preventing rust. I would therefore have it understood that the treatment according to my invention differs from these previous proposals, in that the iron or steel is subjected to the action of a dilute solution of ordinary phosphoric acid, whereby I effect a deposit thereon consisting of a mixture of normal ferric and ferrous phosphate of iron.

"According to this invention, the iron or steel or the articles composed or having a surface of iron or steel is or are subjected to treatment which has the effect of furnishing the same with a covering or deposit of phosphate of iron; whereby it is found that the metals or articles are rendered immune from the deleterious influence of oxidation or rusting.

"In carrying out the invention, the iron or steel or the article composed or having a surface of iron or steel is immersed in, or otherwise subjected to, the action of a compound consisting of a dilute solution of ordinary phosphoric acid, a suitable substance, such as iron filings, ferrous phosphate or other appropriate compound, being also employed for the purpose of controlling or regulating the rapidity or strength of the chemical action upon the metal or articles undergoing treatment; the employment of a controlling or regulating material, although preferable, is not, however, indispensable; the essential feature of the invention being the protective covering or deposit of the aforesaid phosphate of iron which, in some instances, may be produced by subjecting the iron or steel surface or article to the action of a dilute solution of phosphoric acid alone, or by passing an electric current through a dilute solution of ordinary phosphoric acid with (or without) the addition of an appropriate substance or compound adapted to control or regulate the chemical reactions.

"A solution or composition which has been found to give satisfactory results, may contain the following ingredients or substances in or about the proportions given, viz.:

"Iron in the form of filings or powder 1 ounce; phosphoric acid, concentrated, 4 fluid ounces; water, 160 fluid ounces.

"For the purpose of my invention, a quan-

tity of the solution containing the above-mentioned ingredients may be placed in an enameled iron bath or other vessel and heated to the boiling point, whereupon the metal or article or articles to be treated, after being thoroughly cleaned, is or are immersed therein, and the solution or composition evaporated to any desired extent, as for example, to about one-seventh of its original volume. The articles thus treated may then be withdrawn, and, after being thoroughly wiped and dried, may be oiled preparatory to use.

"The coating or deposit, produced upon the surface of the article, by the process above described, which consists of phosphate of iron, may be strengthened or thickened if necessary by repeating the process, or by adding a further quantity of phosphoric acid and iron filings or powder to the solution after partial evaporation, and then diluting and reevaporating.

"Should the coating or deposit be undesirably thick, the excess may be readily removed by subjecting the coated article, upon withdrawal from the bath, to treatment by cold water. If it be desired to vary the tone or color of the coating or deposit, the metals after the completion of the aforesaid process may be immersed in a cold or boiling solution containing substances such as sulfids, tannic acid or such substances may be used in the original bath together with the other ingredients before mentioned. Discretion should, however, be exercised in the selection and employment thereof so as not to impair the efficiency of the coating or deposit of the phosphate of iron.

"Various mechanical contrivances may be employed for carrying out the process of immersion or treatment. For instance, the articles may be inclosed by a screen or cage whereof the walls are perforated or constructed of wire, muslin, or other cotton or woolen fabric of such a mesh as will prevent the passage of fine particles, such as the iron filings, when used, while permitting of the free passage of the solution.

"The above-mentioned screen or cage may be used in conjunction with a cage or drum adapted to be rotated so as to effectually bring the surfaces to be treated under the action of the solution, but more particularly to prevent irregular deposits. If rotary motion may be employed, the first-mentioned inclosing cage or screen may in some cases be dispensed with.

"What I claim and desire to secure by letters patent of the United States is:

"(3) In a treatment of iron or steel or articles composed or having a surface of iron or steel, a compound consisting of a dilute solution of ordinary phosphoric acid with the addition of a substance adapted to control or regulate the chemical reactions, substantially as and for the purposes specified.

"(4) In the treatment of iron or steel or articles composed or having a surface of iron or steel, the solution or composition consisting of ordinary phosphoric acid, iron, and water, in or about the proportions hereinbefore stated.

"(5) A protective covering for iron or steel or articles composed or having a surface of iron or steel, comprising, as an essential constituent, normal ferric and ferrous phosphate of iron, for the purposes specified.

"(6) Iron or steel or articles composed or having a surface of iron or steel furnished with a coating or deposit of phosphate of iron, substantially as hereinbefore described for the purposes specified."

No claim is made by either plaintiff or defendant that the deposit of phosphate of iron by passing an electric current through a dilute solution of ordinary phosphoric acid has ever been commercially attempted, and this portion of the patent may therefore be entirely disregarded. Claims 1 and 2 are not before the court for adjudication. As the plaintiff placed no particular stress on the utility of "a screen or cage whereof the walls are perforated or constructed of wire," etc., no comment will be made on this portion of the patent. Both the plaintiff and defendant employ a rotatable cage or drum in rustproofing, but the use thereof is not set forth in the claims, but it may be said, however, that its use in the art is suggested for the first time in the patent in suit and its utility is unquestioned.

### The Invention.

The patent in suit is antedated by British patents No. 3119 of 1869 to Ross and No. 1315 of 1879 to Ramsden. It is seldom that an art which has proved to be of such marked value has so little history, and it is seldom that a patent so fully discloses what is recognized at this late date as necessary to accomplish the desired results.

Coslett fully describes:

(a) The use of dilute solution of ordinary or ortho-phosphoric acid;

(b) The use of iron filings or other suitable substance to control the chemical action; and

(c) Boiling the articles to be processed in a dilute solution and thereby evaporating the solution while the work is being processed.

He further sets forth the proportions of water, acid, and iron which may be used to form the solution, and directs that the work may be left in this boiling solution for any desired length of time, suggesting the limit to be when the solution has evaporated to one-seventh of its original volume.

The testimony of the experts for plaintiff and defendant is in accord on several facts which seem to be basic. The first is that, when phosphoric acid reacts with iron, ferrous di-hydrogen phosphate is produced, and that this material is very soluble in water. Second, when a dilute solution of this salt is boiled, some of the ferrous di-hydrogen phosphate is dissociated into ferrous mono-hydrogen phosphate and free phosphoric acid; the ferrous mono-hydrogen phosphate being only slightly soluble in water. Third, that, if articles of iron or steel are properly cleaned and then immersed in this boiling solution, reaction occurs between the iron of the work and the substances in the solution which results in a coating of insoluble phosphate of iron on the exposed surfaces. Fourth, that this reaction is probably chiefly between the ferrous di-hydrogen phosphate and the iron of the work, resulting in the splitting up of this phosphate so as to form the comparatively insoluble ferrous mono-hydrogen phosphate and hydrogen; the ferrous mono-hydrogen phosphate being in part in the form of the coating and in part in the form of sludge which settles to the bottom of the tank, while the hydrogen escapes.

The experts are not in full accord as to the exact action of the acid—one theory being that the free acid reacts with the iron of the work to produce the original ferrous di-hydrogen phosphate, which in turn, again reacts with the iron of the work to produce the coating and the sludge, the continued boiling splitting up some more of the original ferrous di-hydrogen phosphate and thus producing more free acid, which in turn reacts with the iron, producing more ferrous di-hydrogen phosphate, which again joins with the iron being treated to form more coating and sludge; while the other theory is that the original ferrous di-hydrogen phosphate directly reacts with the iron of the work to produce the coating and ferrous mono-hydrogen phosphate, and that the free acid reacts with this ferrous mono-hydrogen phosphate, and produces more ferrous di-hydrogen phosphate which immediately dissolves and is ready to react with the iron of the work. All the experts seem to agree that when the solution gets to be "in balance," the action is the same in the process described in the patent in suit and in the process used by the defendant.

The term "in balance" has been defined to be that condition of the solution where the ferrous mono-hydrogen phosphate and the free acid are in such proportions relative to each other, and to the ferrous di-hydrogen phosphate and the water, that an insoluble coating of ferrous mono-hydrogen phosphate will be formed on articles of iron or steel immersed in the solution with a minimum of erosion or pickling of the work.

The testimony shows that solutions that vary quite widely in free acid content may be "in balance" if approximately the right amount of iron as ferrous di-hydrogen phosphate is also in solution; this free acid varying from one-fourth of one per cent. and even less to as high as three per cent. Such solutions must be said to be dilute solutions within the meaning of the patent.

The testimony further shows that the necessary iron to bring the solution in "balance" need not be extraneous iron, such as filings or borings, subjected to the acid before or after the water is added, but that under certain conditions, as when the work is of such a character that the loss of a few per cent. is of little consequence, a dilute solution of acid in water alone may be employed; the reaction of acid and the iron being treated producing the proper phosphates to bring the solution in "balance."

The testimony further shows that, when the solution is boiled, it evaporates, reducing the water of the solution and increasing the percentage of acid and phosphates, but that, when the solution is evaporated while containing articles of iron or steel being treated, this percentage of increase of acid and phosphate is counterbalanced by a corresponding decrease in acid and phosphate owing to the coating of the articles being treated with insoluble phosphates. The pull in one direction is balanced by the pull in the opposite direction. The deposited coatings are here considered as ferrous mono-hydrogen phosphates for the sake of simplicity, and the testimony of the experts is that the coatings are probably largely of this phosphate, mixed with other phosphates lower in hydrogen, such as the normal phosphates, or that the coatings are formed of phosphates which are in composition somewhere between the normal and the mono-hydrogen salts. On this point they do not agree, but the coatings formed by both the process of the patent in suit and that used by the defendant are the

same, and the exact composition need not be considered at this time.

The solution is reduced in amount by evaporation, and the acid and dissolved phosphates decrease as a result of the chemical reaction with the iron. Therefore the percentage of acid and dissolved phosphates may in this way be kept approximately constant, the bath may be replenished as desired from a supply of the original solution, and the process may be carried on continuously, if desired. As the solution remains in "balance" while the work is being treated, it may be mostly used up, so that a single small tank can be prepared as occasion demands to rustproof articles where there is but little demand for such work, with little loss of material. This extreme flexibility of the Coslett process indicated an invention of high order. A slight excess of acid is not objectionable, as it cures itself by taking up a small percentage of the iron of the article being treated, while a slight excess of dissolved iron cures itself by precipitating as sludge. Natural laws work to bring the solution into "balance."

[1] A balanced solution seems to result in the work being treated gaining slightly in weight and a slight excess of acid seems to prevent this gain. A considerable excess of acid results in the work losing weight. The Coslett formula used with the 66 per cent. acid of the British Pharmaceutical Codex of 1907, p. 42, seems to be so nearly balanced that the loss or gain are both negligible. It is impossible to state at this late date whether Coslett thought that a slight excess of iron was to be preferred to a slight excess of acid. However it is construed, the patentee has given a formula in his patent in suit which is practical.

The experts also seem to agree that there may be a "local balance" on the surface of the work, which results from acid reacting with the work to form ferrous di-hydrogen phosphate, and this local di-hydrogen phosphate reacts with the iron, forming a rustproof coating which is not dissolved by the acid of the solution, which solution may be somewhat higher in acidity than is usually the case when the solution is generally "in balance." The reason seems to be that this action of the acid on the iron which is being coated leaves the solution in immediate contact with the work, or constituting a skin on the work, so low in acid and high in iron that it is "in balance" locally, thus permitting the coating to form. If, however, the solution were agitated and the percentage of acid kept uniform throughout the tank, such local conditions could hardly exist.

The testimony has not shown what the ideal or most desirable solution should be, for the solutions reported all varied slightly in acid and iron. I am convinced that a slight amount of free acid is desirable, for it can immediately attack the work and produce the ferrous di-hydrogen phosphate. The free acid which was found in each solution, whether three-tenths of one per cent. or more, is the same kind of acid as was originally used. When a solution is in balance, it contains just the right amount of free acid for the salt present.

### The Prior Art.

[2, 3] As stated before, the prior art is restricted to the patents of Ross and Ramsden. Ramsden teaches nothing not taught by Ross. Ramsden's patent covers the production of steel wire and his statement that he immerses his wire in "glacial phosphoric acid dissolved in water," thereby "in a great measure to prevent it from rusting and in some cases very much increasing the temper thereof," clearly indicates that he never attempted to use this idea, otherwise he would not have mentioned the increase in temper. Witnesses for both parties have characterized this statement as absurd, so the conclusion must be reached that he attempted to embody the disclosure of Ross. Furthermore, the words "dissolved in water" are so indefinite that any one attempting to follow the teachings of Ramsden would necessarily perform a long line of experiments before getting down to that extreme dilution first disclosed by Coslett which has been shown necessary to produce the desired result.

Witnesses for defendant have shown that when glacial phosphoric acid is dissolved in water, so that the solution is very dilute, and the solution is then boiled, work may be properly rustproofed thereby while the solution evaporates, but each and every one of these witnesses was familiar with the Coslett patent in suit, and the process practiced was that of Coslett and not of Ramsden. One of defendant's witnesses stated that he was certain that he could have arrived at the proper solution within three days, having nothing but the Ramsden patent before him. But this does not constitute a disclosure according to the rule laid down in Selectasine Patents Co. et al. v. Prest-O-Graph Co. et al. (D. C.) 267 F. 840, 842, 843:

"Such vague, indefinite, and ambiguous descriptions and delineations, especially when contained in a foreign patent, are far

from sufficient upon which to predicate disclosure. The rule is that the reference, to be sufficient upon which to predicate anticipation, 'must be so clear and definite as to enable any mechanic skilled in the art to reach the patented invention certainly, directly, and without the necessity of any experiment, and this rule is enforced with peculiar strictness when the alleged disclosure is found in a foreign patent or publication.' Hoskins Mfg. Co. v. General Electric Co. (D. C.) 212 F. 422, 429; Seymour v. Osborne, 11 Wall. 516, 555, 20 L. Ed. 33; Berry v. Wynkoop-Hallenbeck-Crawford Co., 84 F. 646, 651, 28 C. C. A. 505; Westinghouse Air Brake Co. v. Great Northern Railway Co., 88 F. 258, 263, 31 C. C. A. 525; Consolidated Car-Heating Co. v. West End St. Ry. Co., 85 F. 662, 665, 29 C. C. A. 386."

Ross, on the other hand, must be given credit for an independent discovery, for he is the first to suggest that phosphoric acid may be used to produce a coating which will prevent rusting. He doubtless did produce a coating that was better than no coating. But the lesson that he taught was of very little value. The statements in his patent that he produced a phosphide of iron which marvelously improved the temper of the articles treated are held to be untrue by witnesses for both plaintiff and defendant. His statements that he used an acid that could be rubbed on by a knife, and that he immersed his work in a solution that he covered with oil to prevent it taking up moisture from the air clearly indicate that he was dealing with a concentrated acid and not a dilute acid.

"Inasmuch as controlling importance is attached by defendants to what is described and illustrated in the prior foreign publications, the rule as to them may be stated here. Foreign publications, to constitute them anticipations of a later invention, must disclose a complete and operative structure, and indeed the description given must be sufficiently clear and definite and understandable to enable persons skilled in the art or science to which the invention or device belongs to practice and construct it." Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33.

Ross deserves great credit, and that credit is given by Coslett in the introduction of his patent, but the Ross disclosure is so vague and indefinite that it can have no effect upon the patent in suit. Ross does not teach any practical manner by which an insoluble coating of iron phosphate can be formed on iron or steel, he does not teach the use of dilute acid, and he does not teach the use of extraneous iron. The fact that expert chemists of the present day have learned from the patent in suit that a dilute boiling solution of ordinary phosphoric acid will and always would have produced an insoluble phosphate coating on articles of iron or steel is no reason why such knowledge should be read into the Ross patent. Giving Ross all the credit that is his due, he must be considered merely as a voyager who sees a new land from afar, locates its latitude and longitude, and notes them in his log book. Coslett is the pioneer who explores the land, determines its characteristics and advantages and the manner of exploiting it, and, after due process of law, takes possession and offers it to the use of the public.

Ross stated to the public in 1869 that there was such a land, Coslett in 1906 gave to the world an accurate account of it, and the 20 years which have passed since that time have not shown a single error in this description. It is true that Coslett has subsequently suggested other methods of making use of this knowledge, but the original disclosure of Coslett still stands as one of the most complete of its kind.

It is true that chemistry has so advanced during the last 20 years that the terms employed by Coslett in the patent in suit are possibly not such as would be employed by chemists of the highest standing to-day. But these terms can be understood, and their meaning is so perfectly clear that this court has no trouble in reaching the conclusion that Coslett gave a description which is so full and exact that any one skilled in the art or acquainted with the subject-matter can carry out the process and obtain the desired result. Several witnesses for the defense have testified that their experience has been different, but the court will give greater weight and more consideration to the testimony of the men who have said that the process disclosed by Coslett would produce the desired results, and who have brought the results into court, than it will give to the testimony of those who said it could not be done and reported a failure. These same witnesses for defendant, when attempting to show that the Ramsden patent anticipates the patent in suit, had no difficulty in producing acceptable coatings by using that phase of the Coslett invention which employs no extraneous iron. The weight of the testimony and inspection of the samples submitted to the court clearly demonstrate that a fair and intelligent endeavor to follow Coslett's instructions will invariably produce the desired result.

Under the decisions, the Ross patent must

be read as it is written. Nothing can be surmised or read into it. Glacial phosphoric acid "hydrated" is a sticky mass, and, although it is less solid then the original glacial acid and therefore may be said to be diluted, it is not dilute in the sense of the Coslett patent. There is no testimony that the Ross process was ever put into use, and no publications have been submitted to indicate that it was ever even discussed by those skilled in the art.

### The Patent in Suit.

Referring again to the patent in suit, the knowledge of to-day establishes that Coslett discovered and in his patent taught the art of rustproofing by the use of dilute phosphoric acid, rustproofing by the use of this acid united with iron, and rustproofing by evaporating a dilute solution while the work was going on so that the solution could be replenished and refortified.

Coslett discovered that he could use the easily obtained ordinary or ortho-phosphoric acid instead of glacial acid, and that this ordinary acid properly diluted would accomplish his purpose. Twenty years of experience has added little to what he taught, and the proportions he suggested in his formula must be substantially followed to-day in order to produce a satisfactory result. The concentration of the acid is not given in the patent, but, as this process is to be used commercially, the ordinary acid prepared for commercial purposes should be selected, and not the chemically pure 85 per cent. acid used in the manufacture of drugs. The German patent applied for by him at about the same date as the patent in suit differs therefrom in that its formula gives the weights of the acid and iron to be used, and when that is followed, even with the highly concentrated chemically pure acid, a slight excess of iron is had. The patent in suit, however, states that the solution "may contain the following ingredients or substances in or about the proportions given," and, with a pioneer patent of this character, a wide variance is permissible, especially as the experts for the defense have stated that the percentage of dilution may be varied within very wide limits.

Whether Coslett knew that glacial acid changed to ordinary or ortho acid when properly dissolved or hydrated is immaterial. He is the first to suggest a dilute acid and the first to give a definite and workable formula therefor and definite directions for using this formula. If there is anything settled and plain in the rustproofing art to-day, it is the necessity of using dilute ordinary phosphoric acid. This was taught by Coslett. He not only knew and taught that this dilution was necessary, but the first three and last two claims of this patent specify "dilute solution of ordinary phosphoric acid," and the fourth claim specifies the three ingredients "in or about the proportions hereinbefore stated." I am convinced that this idea of dilution is of great value and should be protected by the courts.

The second landmark established by Coslett is the use of extraneous iron. Defendant pointed out that one Erlenmeyer had suggested the preparation of iron phosphate for medicinal purposes, but this disclosure in a nonanalogous art gave no hint as to the value of added iron for rustproofing purposes. This idea is so valuable that the defendant uses an excess of iron in order that its rustproofing solution may carry a maximum proportion thereof. No suggestion thereof is found in the prior art.

Defendant's experts pointed out that, if the acids of Ross or Ramsden were properly diluted and used a number of times on batches of work, these solutions, in time, would become sufficiently charged with dissolved iron to produce good rustproof coatings. But this lesson is entirely missing in those patents, and is found nowhere until the Coslett patent was published.

Defendant's experts testified at length that the Coslett patent was lacking in fullness, clearness, and distinctness, because he neglected to state how or when he combined his acid, water, and iron. But the convincing testimony produced by plaintiff demonstrates that it is absolutely immaterial whether the acid, water, and iron are allowed to stand cold until the iron is dissolved, or whether they are boiled until the solution is complete, or whether the acid and iron are permitted to coact either hot or cold before being put into solution. Nor does it make any difference whether or not the solution is boiled after it is complete and before the work is put in. All that is necessary is to make a dilute solution in any desired manner, bring it to a boil, immerse the work, and continue to boil until chemical action ceases, which is indicated by the absence of the hydrogen bubbles. Whether a cover is on or not at any stage of the process in absolutely immaterial so far as the results and the scope of this patent are concerned.

The statement in the patent in suit that the added iron is "for the purpose of controlling or regulating the rapidity or strength of the chemical action" is very apt. The

iron and not the sludge regulates the chemical action, and the resulting uniformity spells uniformity of service. This inventor knew that the addition of this outside iron would also save the surfaces of the articles to be treated.

The third great advance in the art taught by the patent in suit is the boiling of the solution. Defendant has objected to the tests submitted by the plaintiff on the grounds that some of them indicated that the solution was boiled before the iron filings were dissolved; that other solutions were boiled after the filings were dissolved and before the work was put in; that it took too long to bring the solution to a boil; and that the solution had not been boiled sufficiently long before the work was removed. When 12 or more batches of work, amounting to about 2 tons, were treated in a tank of somewhat more than 200 gallons capacity, without replenishing, this process was objected to because Coslett was silent on that score, and especially because a cover had been left on the tank a portion of the time. The results were always the same in the important feature that the coatings produced were good.

It was a valuable thing to have the iron filings in solution in the tank and the Coslett patent is broad enough to cover this idea, but the other idea of bringing the solution to a boil and then continuing to boil while the iron is being treated is equally valuable, and the Coslett patent is the first to point out the necessity for it. Boiling results in evaporation, which is not only valuable but necessary, and no one has ever satisfactorily coated without it. Replenishing is impossible without it and replenishing means repeating the process after finishing the first job. Defendant suggested that replenishing could be avoided by preventing evaporation and putting in a proper salt. No one has done this, because the desirable way to carry on this work is by evaporation. Whether the replenishing is gradual or at longer intervals is something for the mechanic to work out, and was unnecessary for Coslett to teach, as either is effective, and Coslett should not be penalized because he did not give this information. This patent is not limited to any particular manner of evaporation, or to a tank with a cover on, or half off, or off entirely, and the use of this process by defendant with a covered tank is therefore an infringement.

As stated before, evaporation tends to make the solution somewhat more concentrated, both in acid and salt; it tends to pull the solution higher up the curve in acidity and iron, and, on the other hand, the very iron being treated lowers the acidity and tends to drag the solution down the curve. So here we have in the Coslett patent an evaporation at the time the work is being treated and the mechanical action of evaporation is pulling in the opposite direction against the chemical action which coats the work; the two tending to hold the solution firmly stable. One would think from its testimony that the defendant invented these principles of nature, and was the first to discover that this push and pull hold the solution in balance. The patent to Coslett is entitled to the credit for the discovery of these facts. The Coslett patent, therefore, is sufficiently broad to cover all processes of rustproofing articles of iron or steel which employ a boiling and dilute solution of phosphoric acid, whether extraneous iron is used or not.

Coslett taught these facts, and he gave a practical formula. He did not limit himself to the proportions listed, for he says, "in or about the proportions given," and he helped the art by saying that there was room for using some judgment. I find that the formula which Coslett gave will produce a good coating, and can be used in business in a commercial way and produce a good commercial result, and that no one ever made a good coating by this or any similar method in advance of Coslett's time.

A second British patent to Coslett of 1909 and a United States patent to Richards No. 1,069,903, of August 12, 1913, were urged to show the patent in suit to be void. I see nothing in this second Coslett patent that leads me to the conclusion that the patent in suit is void, or even restricted. Coslett in his second patent points out more openly that he could put the iron filings and acid together first and then add water. At the most it is an improvement patent, and its process would infringe the patent in suit, for the result of both is the same. The order of uniting the iron, acid, and water does not matter one whit, and it can be done in the way that best fits the factory or business where the process is to be used.

The defense criticizes plaintiff's tests because the loads treated were not uniform. They were regular factory loads, varying in size, weight, and surface proportions, put in one after another, and all the results were good, and the solution stayed in balance. Had the loads been uniform, the results would not have been as convincing.

When Coslett stated that he used "a quantity of the solution," he meant that he could replenish with some of the original solu-

tion that was left, for he was thinking on a small scale, and not the scale of a factory working three shifts and thousands of men, with miles of lines through which a machine goes in the process of development, and with each step controlled by a different man. His patent, however, would have been good if he had stopped his description after telling how to treat the first article and had left it for common sense to carry the process further by replenishment without throwing away the remainder of the solution and without making a new solution every time a batch of iron was treated.

But he went further and gave full instructions as to how to replenish by using the same ingredients and in the same proportions as were used in preparing the original solution.

It is not necessary to evaporate down to one-seventh at each treatment, for Coslett says that the solution may be evaporated "to any desired extent," and he then indicates a stopping place. The work must be left in the solution until properly coated and the solution evaporated while the work is going on "to any desired extent." Nature provides an indicator in the hydrogen which bubbles up, for when that stops the work is finished.

The Richards patent is also an improvement patent, and specifies the use of manganese salt in place of iron salt, and the resulting coating contains both manganese and iron phosphates. When zinc is used, that also produces a coating, which has an atom of zinc in the phosphate molecule. Neither interferes with the original process, and both follow in the path marked out by Coslett who is the first to teach the real thing. His is a flesh and blood patent, while those of Ross and Ramsden are but paper patents. Coslett has established three fundamental ideas, each of which may be termed a basic discovery, and they are the dilute acid, the use of extraneous iron, and the boiling of the solution. The second may be omitted because the iron is supplied by the article treated, but the first and third are vital to this art.

[4, 5] I have no doubt whatever but what this patent is valid and is a pioneer patent. It would be unjust to hold otherwise simply because an attorney made an ill-advised argument while the application for the patent in suit was before the Patent Office. The original claims were retained, and there is a serious question among the experts in this case whether a solution of glacial phosphoric acid does not produce a coating of meta-phosphates on iron before the meta acid is converted into ortho. However, the cases are in accord that such an argument has no effect upon the scope of the claims. Burns v. Automatic Recording Safe Co., 241 F. 472, 154 C. C. A. 304; Auto Pneumatic Action Co. v. Kindler, 247 F. 323, 159 C. C. A. 417; Spalding & Bro. v. Wanamaker, 256 F. 530, 167 C. C. A. 607; Baltzley v. Spangler Loomis Mfg. Co. (C. C. A.) 262 F. 423; American Cone & Wafer Co. et al. v. Denaro (C. C. A.) 297 F. 913.

The claims in issue are Nos. 3, 4, 5, and 6.

Claim 3 expressly specifies a dilute solution of ordinary phosphoric acid. The word "ordinary" does no harm, and I am not sure but what Coslett did discover something of value when he found he could use ordinary acid instead of glacial, but he expressly points out that he uses a dilute solution which is mentioned in this patent for the first time. He further specifies the "substance adapted to control or regulate the chemical reactions" which might even cover the use of manganese or zinc in place of iron. The compound described or stated in this claim is not anticipated, and the claim is valid.

Claim 4 is again for the solution, and expressly mentions the extraneous iron, and there is no question at all in my mind but what this claim discloses novelty enough to make it valid, and that the combination is valuable. I hold this claim to be valid. Coslett was the first to put in any extraneous iron, and this is a valuable idea.

Claims 5 and 6 describe the product produced by the solutions mentioned in the specifications. In claim 5 Coslett mentions as ingredients "normal ferric and ferrous phosphate of iron," while in claim 6 he does not attempt to be so particular in his description of the character of the coating. Coslett is the first to describe a workable process for producing a phosphate coating, and is the first to state that he produces a coating of "phosphate of iron." In claim 5 he selects from the essential constituents of the coating the normal ferric and ferrous phosphates of iron. Defendant claims that there is some doubt as to this coating containing these two normal phosphates, but, judging from the testimony as a whole, I am of the opinion that Coslett was right in holding that his coating contained normal ferric and ferrous phosphates.

There are at least three theories which may be applied to such a coating when analyzed. The first is that, when analyzed for ferric iron, ferrous iron, and phosphorus, the proportions indicate a definite, fixed, uniform

compound or salt. The second is that such analysis indicates the definitely known normal phosphates mixed with mono-hydrogen phosphates of iron. The third theory is that such analysis indicates basic salts mixed with quite acid salts. They all agree that the normal phosphate theory is well known, and I am convinced that Coslett used the language of his day in describing what he had. There is no question but what the defendant's coatings are substantially the same as those produced by the Coslett process. I hold that claims 5 and 6 are valid.

As to the infringement, I find that what has been done by the defendant in a big way is nothing but what Coslett did in his little way. The defendant has divided up the process of the patent in suit into steps, which, while this may be an improvement, comes to exactly the same end. Defendant takes a crock and places therein phosphoric acid and iron and permits them to form a paste of ferrous di-hydrogen phosphate. This paste is then placed in a tank with 112 parts of water and boiled. It is then run down into the treating tank as a dilute solution of phosphoric acid, iron, and water; the iron being in the form of ferrous di-hydrogen phosphate and some other phosphates lower in hydrogen, as in the solutions prepared by the Coslett formula. The solution is more dilute than in the Coslett formula, but the action is the same, and the results are the same. The chemical actions from the crock to the treating tank are the same as in Coslett's tank. The solution is boiled as directed by Coslett and is evaporated. Hydrolysis takes place in one as in the other and was not invented by the defendant.

The solution and the action on the work in the treating tank of the defendant are the same as in the Coslett tank, whether written with one formula or the other, for nature is doing for defendant what it was doing for Coslett. It is true that Coslett did not describe the sludge, but he must have obtained some, for defendant produces such quantities that it must be shoveled out. I find nothing in Coslett that is not found in the defendant's process, solution, and coatings. I find the boiling, the evaporation, and the replenishing. I find that the defendant uses in the treatment of iron or steel a compound consisting of a dilute solution of ordinary phosphoric acid with the addition of a substance adapted to control or regulate the chemical reactions as stated in claim 3, and that this substance is iron as stated in claim 4. I also find that defendant produces articles of iron or steel furnished with a coating or deposit of phosphate of iron as stated in claim 6. I find that there is always normal ferric and ferrous phosphate of iron present in this phosphate coating as stated in claim 5. The defendant seems to have tried to prevent normal ferric phosphate being formed, but it does form, and infringement is not avoided because there is only a little of it present.

This is a valuable patent, it is a basic patent, and a number of manufacturers have been licensed under it. Those licensed under the other patents owned by the plaintiff are also licensed under this patent, and all use the principles taught by Coslett.

The issues necessarily involved in this case are not complicated. The important and determining question is that of infringement. The facts which are undisputed clearly establish that the defendant has for a period of several years been infringing the patent in suit. It has attempted in this case to show lack of infringement by raising chemical and technical questions which have taken a great deal of time, and if it were necessary to decide all of these questions and theories the lawsuit would be a difficult one for the court.

A decree will be entered for the plaintiff holding claims 3, 4, 5, and 6 of the patent in suit valid and infringed, that the plaintiff have the usual recovery, and directing reference to a special master to compute the usual profits and damages to be recovered.