**UNITED STATES v. PARKER–RUST–PROOF CO. et al.**

No. 3653.

District Court, E. D. Michigan, S. D.
May 12, 1945.

806

Francis Biddle, of Washington, D. C., Samuel S. Isseks, of New York City, and Creighton R. Coleman, of Washington, D. C., John C. Lehr and Arnold W. Lungerhausen, both of Detroit, Mich., John R. Niesley, of Great Neck, L. I., N. Y., and

Julien Caplan, of New York City, for plaintiff.

Arthur Dickey and Harness, Dickey & Pierce, all of Detroit, Mich. (Clarence E. Wilcox and Anderson, Wilcox, Lacy & Lawson, all of Detroit, Mich., and Bert D. Chandler, of Hudson, Mich., of counsel), for defendants.

John P. O'Hara, of Detroit, Mich., for intervening defendants.

LEDERLE, District Judge.

Findings of Fact

1. This is an action brought in accordance with the provisions of 15 U.S.C.A. §§ 4 and 25, to restrain and prevent the alleged violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1 and 2, and the Clayton Act, 15 U.S.C.A. § 14.

2. The defendant, Parker-Rust-Proof Company, hereinafter referred to as "Parker," is a Michigan corporation. From 1930 to 1936, it organized and controlled certain subsidiary corporations but these corporations were absorbed by Parker in December, 1935. The Government does not claim that anything undertaken by the formation and subsequent assimilation of these companies or by their control violated the Anti-Trust Laws.

The individual defendants named are citizens and residents of Michigan and officers of Parker, and all of their acts referred to in the complaint were performed as officers of the corporation.

During the course of the trial, a petition for intervention was filed by Rust Proofing and Metal Finishing Corporation, located at Cambridge, Massachusetts, Pyrene Manufacturing Company, located at Newark, New Jersey, Parker Wolverine Company, located at Detroit, Michigan, Western Rust-Proof Company, located at Chicago, Illinois, and Parker Rust-Proof Company of Cleveland, located at Cleveland, Ohio, and these parties were permitted to intervene as defendants and to take part in these proceedings. They will hereafter be referred to as intervenors.

3. The twenty-nine page complaint sets forth in great detail the acts of Parker which are alleged to violate the laws involved, together with much explanatory matter. In brief, it charged that Parker attempted to, and did, secure a monopoly of the so-called rust-proofing business by the illegal use of its patents, by conspiring

with some of its licensees, and by entering into illegal agreements for the purchase of the businesses of its most important competitors, with provisions in the purchase contracts which prohibited these so-called co-conspirators from again competing with Parker.

4. At pre-trial hearings under Rule 16, 28 U.S.C.A. following section 723c, stipulations comprising 98 pages were entered into, admitting, without further identification, a large amount of documentary evidence, which greatly reduced the time and expense consumed in actual conduct of the trial. See: Sunderland on "Pre-Trial," 28 Journ.Am.Judicature Soc., page 48. All officers and employees of Parker cooperated to the fullest extent with the Government attorneys and agents in furnishing them with documentary evidence they desired to use. The officers and employees of Parker called as witnesses fully and frankly disclosed all the information which the Government sought. There is no dispute as to the authenticity of the documents offered in evidence and no conflict in testimony to be resolved. In fact, there is no dispute between the parties as to the underlying facts, but a real controversy exists as to the inferences to be drawn from these facts, and, hence, as to the ultimate facts upon which a judgment must be based.

5. Some Parker agreements and policies might be unreasonable under some circumstances, whereas viewed in the light of actual experience, these agreements and practices are perfectly justified. In order to understand the issues involved, it is necessary to trace the history of Parker. From a modest beginning, Parker has developed into a substantial industry, and is extensively engaged in interstate commerce out of which the acts complained of arise. During peace time, Parker aided materially in developing many important industries. More recently, it has contributed substantially to our war effort in improving the materials used at the battle fronts. The company was organized in 1915 for the purpose of promoting the use of chemical coatings applied to metal surfaces, particularly iron and steel, to prevent or retard the corrosion thereof, and to provide a basis for paint or other finish. Most of Parker's business has related to so-called phosphate coating. Parker first acquired a patent issued August 12, 1913, to Richards, United States No. 1,069,903. In the light of modern developments, the Richards patent taught a rather crude method of achieving the desired result. At first, Parker had very little capital and its business was confined almost entirely to treating small parts used mainly in connection with the automobile industry. Shortly after starting to use the Richards process, Parker purchased United States Patent No. 870,937 issued to Coslett November 12, 1907. The Coslett process achieved considerable success, and, in 1925, Parker brought suit against the Ford Motor Company, charging infringement of this patent. After a lengthy and expensive trial, Parker was awarded a decree for substantial damages. See Parker Rust Proof Co. v. Ford Motor Company, D.C., 6 F.2d 649; Id., D.C., 23 F.2d 502; Id., 6 Cir., 41 F. 2d 1010.

6. Parker has always maintained a staff of chemists and other expert technical employees for two reasons: First, to improve its products and processes; and second, to aid and assist its customers in carrying out the patented processes. During its entire history, it has had the active competition of other forms of corrosion prevention, such as, galvanizing, sheradizing, plating and other similar processes.

7. From the day of the ancient alchemist, scientists have labored to devise means for endowing the baser metals with the quality of permanency of the higher metals. There is evidence that phosphates were used to protect iron articles as early as the third century. In 1869, metals were commercially treated with phosphoric acid. It was found that this changed the surface of the metal and made the iron and steel more rust resistant. Volumes have been published on the subject of corrosion control. An interesting discussion of the Parker processes appears in a volume entitled, "Protective Coatings for Metals," by Burns and Schuh, one of the American Chemical Society monograms. Other publications reviewed during the trial were: "Corrosion—Causes and Preventions," by Frank N. Speller, and "Protective Films on Metals," by Ernest S. Hedges.

During its entire history, Parker has been in competition with many other scientific organizations, engaged in a search for better means to improve the surface of metals to make them more rust-resistant and to improve them for painting and other finishes. The opportunities in this field are limited only by the knowledge of the prior art and the imagination and energy of the individual who desires to enter it. The

only monopoly Parker ever had on these processes is the monopoly that it acquired because of the patent laws. As its patents expired, others were free to use the processes disclosed in such patents and others have entered this field.

At all times, Parker has depended for its business and commercial success upon its control of particularly patented processes and its aggressive salesmanship, coupled with its policy of locating and employing able technical men to improve its products and to interest manufacturers in the use of its products and processes. These employees have been under contract to turn their inventions over to Parker and to assign to it any patents issued therefor. Before the Richards and Coslett patents had expired, Parker had developed new products and processes which had greater usefulness. In 1930, a new process was invented by two of its employees, Tanner and Lodeesen, and the patent for this process was assigned to it. The process disclosed in this patent, No. 1,911,726 issued May 30, 1933, made it possible to coat articles in a much shorter period of time than had previously been possible. Parker has been extremely successful in inducing manufacturers to use this improved process, which has resulted in a large increase in its business and a substantial profit to it and benefit to the public.

8. Chemicals used by Parker in the various processes covered by its patents are in common use for many other purposes, and can be purchased in the open market throughout the nation. At no time did Parker make any attempt to monopolize control of these raw materials.

9. If Parker or some other company had not actively promoted use of the processes disclosed in the patents, these processes would never have reached the wide use that they have achieved at this time. Any company engaged in promoting the use of patented processes must be diligent in order to reap the benefits of the patent prior to its expiration. There may be room for an honest difference of opinion as to whether or not the methods used by Parker to promote the use of its patents were the best methods. It is certain, however, that few patented processes ever go into extended public use unless someone actively promotes their use. It is always difficult to get customers to adopt a new and unfamiliar process, especially when this requires the installation of added and expensive equipment. A meritorious patent may remain buried for many years before some enterprising individual or company is willing to take the risk necessary to its promotion. There can be no better evidence of this than the fact that the Coslett patent, which issued in 1907, never went into extensive use until Parker promoted it. The recent case of Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 65 S.Ct. 647, contains an additional illustration of this. It is clear that throughout Parker's history it has never attempted to restrict the use of its products and processes, but its constant aim has been to increase their use.

10. The important Parker patents have both process and product claims. None of the compositions sold by Parker have any use other than in connection with the processes covered by the patents.

To be certain that Parker processes were properly practiced, so as not to injure the company's good will, it has found that constant supervision by its technical experts in the user's plant was necessary. At the beginning, it appeared to Parker that this could only be done if the agreements with purchasers restricted use of the materials to the customer's plant. Later this was found unnecessary and this provision was not included in its sales agreements.

11. At the date of the trial most of Parker's business was carried on with very large corporations referred to in the record as manufacturer customers. The so-called manufacturer customers altogether accounted for 97% of Parker's business. Except for the agreement with the Norge Division of the Borg-Warner Corporation referred to in Finding No. 18, all of these customers were treated alike. There was never any understanding or agreement between Parker and these customers with the object in view of preventing the customer from using materials or processes of Parker's competitors. None of the agreements entered into with the manufacturer customers had the effect of substantially lessening competition or creating a monopoly in any line of commerce. There is no evidence that Parker ever refused to sell materials to a manufacturer customer for the failure of the customer to live up to the agreements, even when the contracts restricted use of materials to the customer's plant.

12. In order to promote its business Parker entered into agreements with par-

ties other than manufacturers to do a jobbing business, that is, treat with Parker processes the work of outside concerns. In certain cases, these agreements contained a provision that the jobbers would have the exclusive right to practice the Parker patented processes in a certain territory. These jobbers are referred to in the record as preferred or exclusive jobbers. These so-called exclusive jobbers also acted as sales agents for Parker and furnished service to manufacturer customers in the territory allotted to them as a substitute for the services rendered by Parker. For this service, the jobbers were paid a commission. As soon as a manufacturer had enough work to justify the installation of his own equipment, he was encouraged to do so. As a result of this policy, the amount of business transacted by the exclusive jobber was always only a small part of Parker's total business.

13. In order to carry on a jobbing business, it is necessary that the jobber make a substantial investment in equipment and employ technically trained operators. To do a successful jobbing business, a jobber must be prepared to handle many different kinds of work, which requires a great deal of skill and more diversified equipment than is necessary in the case of the manufacturer processing his specific product. It would be impossible to induce parties to equip plants to do a jobbing business unless Parker agreed not to license other jobbers in the territory specifically allotted to the first jobber secured. In order to be fair with these jobbers, it has been Parker's custom not to license any more jobbers than could be reasonably successful with the amount of work available. Before a new jobber's license was granted in a territory that had already been allotted, it was Parker's custom to consult with the licensed jobber therein and give him an opportunity to demonstrate that he could take care of all the business available. This policy was carried out not to restrict trade in Parker's products, but rather to increase it by insuring the successful jobbing of all available work. Although Parker has consulted with these jobbers relative to costs and prices, it has never conspired with any of these jobbers to fix prices to be charged for the service or to restrict in any way trade or commerce in the finished articles. None of these preferred jobber agreements had the effect of substantially lessening competition or creating a monopoly beyond the legitimate scope of the monopolies granted under the patent laws. Neither Parker nor any of these licensees ever used any of the patents to restrict trade in any process or material not covered by the patents. These exclusive jobbers have performed a valuable service for Parker in promoting the uses of its products and processes. All of the intervening defendants are so-called preferred or exclusive jobbers.

14. A small number of non-exclusive jobbers were licensed to carry out the Parker processes on substantially the same basis as the manufacturer customers. None of the Parker agreements or dealings with these so-called non-exclusive jobbers tended in any way to restrict trade or commerce or to create a monopoly, but, in fact, had just the opposite effect because these licensees were at all times free to use any competing process developed at any time.

15. The officers in charge of company policies own only a small part of its outstanding stock. Parker has not maintained a rigid price policy, but has adjusted its prices to conform to changing conditions. As its business increased, it reduced its prices and, hence, the cost of treating metals. There is no evidence that it has ever earned excessive profits.

The standard measurement used for computing prices paid by Parker customers was the quantity of material used. It made no difference to a licensee under a Parker patent whether it paid a licensee fee on the basis of amount of work processed or whether it bought patented compositions from Parker at a price that included a royalty. Obviously, it is simpler both for Parker and the customer to figure royalty on the basis of quantity of material used than on the basis of amount of work processed. As a practical matter, the result would be substantially the same.

16. Prior to 1932, American Chemical Paint Company, a Pennsylvania corporation, was engaged principally in furnishing materials for cleaning metal surfaces prior to painting or other finishing. In 1932, it started furnishing materials for phosphate coating, and almost immediately came into conflict with Parker. Frequent controversies arose between the two companies over claims that American was infringing Parker patents. Parker threatened to bring suit against American and some of its customers if the practices of American did not cease.

Attempt was made to adjust the difference between the two companies by a cross license of the patents or a merger of the two companies, or the purchase by Parker from American of its rust-proofing patents. None of these proposals was carried out and American continued to be an active competitor of Parker up to October, 1940, when the agreement hereafter referred to was entered into.

17. In February, 1937, Parker brought suit against the Norge Division of the Borg-Warner Corporation, in the District Court for the Western District of Michigan; Norge being one of American's customers or licensees. American was not a party to this suit. That court held that the American process carried on by Norge did not infringe Parker's patent in suit, the Tanner & Lodeesen '726 patent. An appeal was taken from this judgment to the Circuit Court of Appeals.

In May, 1937, American brought suit against Parker in the District Court of the Eastern District of Michigan under the Declaratory Judgment Act, in which it sought a judgment that this same '726 Parker patent was invalid and not infringed by American's processes and materials. Parker filed a counterclaim in which it alleged that the American processes and materials infringed this patent. This court entered a judgment holding Parker's patent valid and infringed by American and ordered an injunction and an accounting. See, American Chemical Paint Co. v. Parker Rust-Proof Co., 32 F.Supp. 908. American took an appeal to the Circuit Court of Appeals from this judgment. An agreement was entered into between the two companies which permitted American to continue servicing and supplying the alleged infringing processes to certain of its then existing customers, pending the determination of this appeal.

18. In December, 1939, James H. Gravel, President of American, died. Mr. Gravel had almost complete control of American and owned substantially all of its stock. Under his will, the control of American passed to a number of its former employees who had been active in the company for many years. In order to settle Mr. Gravel's estate it became necessary to raise cash to pay taxes. Negotiations were entered into between Parker and the new officers of American, in which it was sought to settle the differences between the two companies, including the litigation heretofore referred

to. In October, 1940, while the two appeals were pending in the Circuit Court of Appeals, an agreement was consummated. By the terms of this agreement, American gave Parker an exclusive license on all of its patents and patent applications relating to rust-proofing for a period of ten years for the sum of $750,000, payable in annual installments, with the provision that the license might be extended for the life of the patents upon payment of an additional $50,-000 at the end of the ten year period. This arrangement, which was in effect a sale, was carried out in this manner to reduce American's income tax. The agreement also provided that American would assign to Parker any improvement that it invented or discovered in connection with the processes covered by the patents during the period of the agreement. Parker in turn agreed to purchase from American all materials that it had on hand for servicing the patents acquired, and it agreed to supply American's customers with the materials necessary for carrying out the processes which American was under obligation to provide. At the same time, Parker entered into an agreement with all of the principal officers and research assistants of American that these individuals would assign to Parker any inventions they might make in this field during the life of the agreement.

The two suits pending on appeal in the Circuit Court of Appeals were terminated under formal stipulations, the Norge judgment in the Western District of Michigan being reversed on appeal and then dismissed without prejudice, and the Parker judgment in the Eastern District of Michigan being affirmed on appeal and other pending infringements suits were dismissed. As a result, American is permanently enjoined from carrying on the principal process that it was promoting prior to the entry of these two judgments.

In order to induce the Norge Division of the Borg-Warner Corporation to consent to the reversal of the favorable judgment it had secured in the Western District of Michigan, American agreed to supply that company with materials for a period of five years at a guaranteed price. Parker in turn agreed to furnish American with the materials necessary to carry out this agreement and agreed to reimburse American for any loss it might sustain because of this agreement to the extent of $1250 per year.

American also granted to Parker the sole and exclusive right to the use of trade marks owned and formerly used by American in connection with its rust-proofing activities.

American also agreed that if it made any new inventions not specified in the agreement, which might make Parker's processes obsolete, Parker should have the first option either to purchase the patents issued for such inventions or to acquire a license thereunder. Neither American nor any of its officers was to receive any compensation for improvements on the patents under which Parker had the exclusive license and, therefore, there was no reason why either American or its employees named should continue in their research because they would not be compensated for their time, expenditures or creations made in connection with such investigations.

19. The 1940 agreement between American and Parker was intended to eliminate American as a competitor and it had that result. It may be that the officers of the two companies did not consciously set out to restrain trade and stifle competition, but this is the effect of the agreement. Neither American nor any of the individual employees named in the agreement have made any improvements on the patents or any new inventions in this field. There is no reason to expect that they will, as they are under obligation to turn them over to Parker. Parker sought to justify this agreement on the ground that it was merely the purchase of patent rights, the settlement of litigation and the purchase of a business. This agreement cannot be justified on these grounds as it went beyond the achievement of these legal ends.

All of the litigation carried on by Parker for the protection of its patent rights, including the litigation against American and Curtin-Howe, was carried on in good faith. The patent laws afforded Parker ample protection against infringement. Patents may be purchased like any other property, but the mere fact that patents are involved cannot justify a contract which has the object or effect of restraining trade or stifling competition. There was no direct relationship between the price paid by American and the value of the patents and other rights which it acquired by this agreement. The primary purpose for entering into this agreement was to eliminate American as a competitor in the rust-proofing field and to terminate its activities in the field of research looking toward the improvement of such processes. Because of the particular kind of business carried on by these two companies, this agreement had the effect of substantially lessening competition in that particular field.

20. The Curtin-Howe Corporation was first organized in New York in 1927. At the beginning, it was solely engaged in promoting the use of wood-preserving inventions developed by Dr. Leo P. Curtin, who is a competent research chemist. In 1932, he assigned to the corporation a patent he had secured for a rust-proofing process. The company started to market this process and immediately Parker claimed that it infringed its patent. Dr. Curtin later made other inventions and received other patents in this field and granted licenses to Curtin-Howe to market these inventions. Almost immediately Parker started patent suits against Curtin-Howe's customers, and the two companies were engaged in interference proceedings in the patent office with respect to their respective pending patent applications.

Dr. Curtin was principal owner of the company and originally controlled its policies. This company was never adequately financed and in 1929 its owner sold 51% of its stock to United Chemical, Inc., for the purpose of acquiring additional capital. The new owners of the majority of the Curtin-Howe stock were not anxious to carry on this business and attempted at various times to sell these patents or to grant exclusive licenses thereunder. None of these negotiations was successful and the business in this field continued to operate at a loss. Up to 1940 the company had lost in excess of $100,000 in attempting to promote its processes. There was considerable disagreement between Dr. Curtin and the other owners of Curtin-Howe as to the policies to be carried out by the company. Dr. Curtin was at all times anxious to dispose of the patents owned by him. United Chemical, Inc., was principally engaged in financing business enterprises.

In November, 1940, Parker purchased all of Curtin-Howe's patent rights in the rust-proofing and priming fields for the sum of $225,000. Curtin-Howe thereupon ceased business and the corporation was dissolved. At the same time the purchase agreement was entered into, Parker retained Dr. Curtin as a consultant on a three year contract and he immediately went to work for that company. At its termination, this contract

was renewed for a period of three years and at the date of the trial, Dr. Curtin was still employed by Parker as a research consultant.

Curtin-Howe never offered any substantial competition to Parker and the purchase of Curtin-Howe patent rights was a legitimate exercise of its rights to purchase. The employment of Dr. Curtin was a legitimate exercise of its right to contract with research chemists and neither agreement was intended to stifle competition. Neither agreement prejudiced the public by unduly restricting or unduly obstructing the course of trade.

## Conclusions of Law

1. This is an action arising under the Sherman and Clayton Anti-Trust Acts of the United States, over which this court has jurisdiction. 15 U.S.C.A. §§ 1, 2, 14; 15 U.S.C.A. §§ 4, 25.

2. The fact that a suit is brought under the Anti-Trust Laws does not change the principles which govern the granting of equitable relief. There must be "a definite factual showing of illegality." Appalachian Coals, Inc., v. United States, 288 U.S. 344. 53 S.Ct. 471, 480, 77 L.Ed. 825; Standard Oil Company v. United States, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926.

3. The Anti-Trust Laws were not enacted for the purpose of forcing every type of business enterprise into a common mold. Each case arising under these acts must be considered in the light of the particular facts involved. Only such contracts and combinations are within the prohibition of the Acts as would by reason of intent or inherent nature prejudice the public interest by unduly restricting or unduly obstructing the course of interstate trade. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663.

4. The general objectives of the Patent Laws and the Anti-Trust Laws are the same. Both are intended to prevent unfair competition. The inventor is protected by the Patent Laws in his exclusive right to the products of his skill and energy. By affording this protection to the owner of an invention, Patent Laws make it possible for the patentee to practice the teachings of the patent without the danger of having those less worthy deprive him of the benefits of his toil and ingenuity. The Anti-Trust Laws were enacted to prevent competitors from contracting or combining in such a way as to put artificial handicaps in the way of intelligent and energetic competitors, who would thus be deprived of the opportunity to serve the public interest.

5. Under the common law, courts protect the owner of a secret process. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016; Becher v. Contoure Laboratories, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752. It would be contrary to the American sense of justice to induce an inventor to make a public disclosure of his invention and then to deprive him of the benefits of his invention by unduly restricting his rights to make use of it.

The Anti-Trust Laws do not include nor embrace contracts entered into in a legitimate exercise of rights conferred under the Patent Laws. Becton, Dickinson & Co. v. Eisele & Co., 6 Cir., 86 F.2d 267; E. Bement & Sons v. National Harrow Company, 186 U.S. 70, 22 S.Ct. 747, 46 L. Ed. 1058.

6. The owner of a patent has a right to fix royalties; to prescribe sales prices; to limit the quantity of articles or the percentage of the whole output which the licensee may manufacture, use or sell; to limit the territory in which the licensee may operate under the patent; to prescribe the purpose or the field for which the licensee can utilize the invention; to determine the number of licensees and to select at his discretion those to whom licenses shall be issued. He may enter into any kind of a contract to protect these rights so long as he does not attach a condition to the contract which will have the effect of enlarging his monopoly beyond that covered by the patent. Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852.

7. In the absence of any purpose to create or maintain a monopoly, the Anti-Trust Laws do not restrict the long recognized right of a manufacturer freely to exercise his own independent discretion as to the parties with whom he will deal and to announce in advance the circumstances under which he will refuse to sell. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443.

8. Some of the terms in some of the sales agreements issued by Parker con-

sidered separately from the historical background and without a full consideration of the particular type of business involved might appear to be an attempt on the part of Parker to prevent the use by a licensee of the raw material purchased from a competitor. These agreements were not intended for that purpose and were never so used. These provisions in the sales agreements were reasonably necessary to protect Parker's rights under its patents and they did not substantially lessen competition nor tend to create a monopoly. They were not tying clauses within the meaning given to that term in International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085.

9. The courts furnish the owner with a remedy for the violation of his patent rights. There is no justification for permitting a patent owner to enter into restrictive agreements to extend those rights. The judgment entered in the District Court for the Eastern District of Michigan, referred to in Finding No. 18, was all that Parker needed to prevent American from infringing on its patent rights. If this judgment was erroneous, it could have been reversed on appeal, and the rights of both parties fully settled. This was different than the situation presented in the case of United States v. United Shoe Machinery Company, 247 U.S. 32, 38 S.Ct. 473, 62 L. Ed. 968, relied upon by Parker to justify the agreement with American. In the United Shoe Machinery Company case, the court found that the patents involved were so inter-related that neither company could get the full benefits of the patents without the consent of the other. The "deadlock" referred to in the United Shoe Machinery case did not exist in the American-Parker case and the American-Parker agreement cannot be justified on that ground. The primary purpose for entering into this contract was to eliminate present competition and prevent future competition. The Anti-Trust Acts condemn a contract entered into for the purpose of eliminating competition that exists as well as a contract preventing the development of future competition. The contract entered into with American Chemical Paint Company and the officers named is illegal and Parker is not entitled to any of the benefits of that illegal agreement.

10. The agreement entered into between Parker and Curtin-Howe Corporation was a legitimate exercise of the right to sell and purchase patent property, and it was not entered into for the purpose of restraining trade or for the purpose of creating or maintaining a monopoly. It was not the type of agreement condemned by the Anti-Trust Acts.

11. The Government has failed to prove that it is entitled to any relief sought except a judgment declaring the agreement entered into between Parker and American and the officers of American therein named to be illegal and enjoining Parker from enforcing any of the rights .secured under the patents covered by that agreement. A judgment according to these findings shall be submitted for entry May 28, 1945.