The **DUNLOP COMPANY, LIMITED,**
**Plaintiff-Appellant and Cross-**
**Appellee,**

v.

**KELSEY–HAYES COMPANY, Defend-**
**ant-Appellee and Cross-Appellant.**

**Nos. 72–1892, 72–1893.**

United States Court of Appeals,
Sixth Circuit.

Argued April 9, 1973.

Decided Aug. 24, 1973.

John A. Young, Fort Wayne, Ind., and Ellsworth H. Mosher, Arlington, Va., for plaintiff-appellant-cross-appellee; Joseph J. Marshall, Helm, Marshall, Schumann & Vanker, Detroit, Mich., on brief for The Dunlop Co., Limited; Stevens, Davis, Miller & Mosher, Arlington, Va., of counsel.

Don K. Harness, Detroit, Mich., for defendant-appellee-cross-appellant; Hugh G. Harness, Harness, Dickey & Pierce, Detroit, Mich., on brief for Kelsey-Hayes Co.

Before PHILLIPS, Chief Judge, LIVELY, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

LIVELY, Circuit Judge.

The subject matter of the two patents involved in this appeal is disc brakes. As originally filed, the complaint by Dunlop alleged that Kelsey-Hayes was infringing four Dunlop patents. Patent number 2,790,516 (hereafter '516) was issued to Dunlop by the United States Patent Office on April 30, 1957, application having been filed on January 22, 1951. In the application for this patent the invention was described as relating to disc brakes and disc brake assemblies for motor vehicles. It was stated that the object of the invention was to provide a disc-type brake for motor vehicles and to provide a wheel and disc brake assembly for motor vehicles. Patent number 2,921,650 (hereafter '650) was

issued to Dunlop by the United States Patent Office on January 19, 1960, application having been made on September 14, 1954. This application recited that the invention related to disc brakes, and more particularly to disc brakes for heavy vehicles, rolling stock, industrial machinery and the like.

In its answer Kelsey-Hayes asserted that the patents were invalid and denied infringement. It also pled a number of affirmative defenses under 35 U.S.C. §§ 102 and 103 and further charged Dunlop with inequitable conduct and violation of the antitrust laws of the United States. In addition to asking that the patents in suit be declared invalid and not infringed, Kelsey-Hayes sought treble damages against Dunlop and its attorneys' fees in the action.

Issues of validity and infringement with respect to all four patents were decided by the District Court, but the rulings with respect to the '516 and '650 patents only have been appealed. The District Court held that '516 is invalid and has not been infringed, and that '650 is valid, but that it has not been infringed by Kelsey-Hayes. Although Dunlop has been a pioneer in the development of automotive disc brakes, neither of the patents in controversy relates to the primary invention of the disc brake. What is involved are certain features of so-called "fixed caliper disc brakes." Prior to World War II drum or shoe brakes were used almost universally on automobiles both in Europe and the United States. During the war disc brakes were developed for military aircraft and both Dunlop and Goodyear Aircraft Corporation, a subsidiary of Goodyear Tire and Rubber Company, were extensively involved in the production of disc brakes for this purpose. The wartime success with disc brakes on aircraft produced an interest in the adaptation of such brakes to automobiles. Dunlop was the leader in England in the development and production of disc brakes which were used on English and European sports cars. The Jaguar was equipped with disc brakes and Dunlop granted licenses to several European automobile manufacturers who equipped their products with Dunlop disc brakes. An exclusive license for automotive use in the United States was granted by Dunlop to Bendix Corporation and this applied to then existing as well as subsequently issued patents.

There was serious resistance to the use of disc brakes in the American automobile industry, based primarily on the fact that disc brakes then in production were designed for the generally lighter European cars and it was felt that they would not perform effectively on the heavier and more powerful cars produced in this country. In January 1961 at a convention of engineers in Detroit an official of Dunlop made a speech in which he discussed automotive disc brakes. Kelsey-Hayes was a leading manufacturer of automotive drum brakes in the United States, and following the Detroit speech, its officers made contact with officers of Dunlop concerning the possibility of further development of the disc brake industry in this country. There were a number of visits back and forth between the personnel of Kelsey-Hayes and Dunlop, and Dunlop released a large quantity of technical information about automotive disc brakes to Kelsey-Hayes. Because Bendix had an exclusive license in the United States from Dunlop, the only way that Kelsey-Hayes could enter the business using Dunlop patents was to obtain a sublicense. On or about July 1, 1963 Bendix did sublicense Kelsey-Hayes under the patents in litigation. Kelsey-Hayes canceled the sublicensing agreement on December 31, 1965, and Dunlop claims that it has been infringing continuously since that date.

The disc brakes and assemblies involved in the disputed patents may be described generally as consisting of a disc or rotor which is attached to the axle and turns with the wheel, and a housing which is fixed to a stationary portion of the vehicle and is of an inverted U-shaped design and positioned so that it envelops only a portion of the

disc. The U-shaped housing consists of a bridge-like part which is set across the top of the disc and perpendicular to its plane and arms extending downward from either side of the bridge, with the disc rotating freely within this structure. Each arm has one or more chambers or cylinders in which pistons are fitted. These pistons are aligned transversely to the plane of the disc. Friction elements or asbestos brake pads, either with or without backing plates, are placed within the housing between the disc and the pistons. Hydraulic pressure is maintained at a level when the brakes are not activated which positions the friction pads within a few thousandths of an inch from the disc. When the brake pedal is depressed additional hydraulic fluid is forced into the cylinders and this moves the pistons toward the disc. The pistons on each side of the disc then push the friction pads against the disc. This pinching or squeezing of the pads against both sides of the disc simultaneously forces the disc to stop turning, which results in a stopping of the vehicle since the disc is attached to the same mechanism as the wheel. When the friction members engage the disc, hydraulic pressure causes them to be slightly compressed against the disc. When braking is completed and the pressurization relaxed, the friction members return to their original positions.

In any braking action the contact between stationary and rotating components produces heat. In the instance of drum brakes, this heat is trapped within the drum, and constant or "hard" braking results in a loss of braking power known as "brake fade." One of the chief advantages of disc brakes is that they permit rapid and relatively unhampered dissipation of heat, thereby reducing the incidence of brake fade. One witness in this case testified that a disc brake is a mechanism which converts the kinetic energy of a moving body into heat and then dissipates that heat. The particular disc brake assemblies involved

in this appeal are referred to as "fixed caliper" brake assemblies. The term "caliper" refers to the housing of the brake. Both in '516 and '650 and in the accused Kelsey-Hayes brake the caliper or housing is stationary and the movement, which occurs when braking is initiated, is confined to the pistons, the friction elements, and their backings. There are, therefore, a number of similarities between the patented Dunlop brakes and the accused Kelsey-Hayes device in terms of design and operation.

*The '516 Patent*

The District Court held the '516 patent invalid, and we will consider this issue first. Kelsey-Hayes, in its answer, asserted that the patents in suit are invalid under the provisions of 35 U.S.C. §§ 102(a), 102(b), and 102(g), which read as follows:

§ *102. Conditions for patentability; novelty and loss of right to patent*

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

\*　　\*　　\*　　\*　　\*　　\*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of

one who was first to conceive and last to reduce to practice, from a time prior to conception by the other. July 19, 1952, c. 950, § 1, 66 Stat. 797.

The holding of invalidity with respect to the '516 patent is based on the "Goodyear evidence." The testimony of witnesses produced by Kelsey-Hayes and accepted by the District Court was that just a few days after it had signed the sublicensing agreement with Bendix, Kelsey-Hayes learned from Ford Motor Company that Goodyear had engaged in considerable activity with respect to fixed caliper disc brakes for vehicles other than aircraft in the period immediately after World War II. The evidence revealed that in the year 1943 Jesse Hawley, an inventor with several patents to his credit, constructed a fixed caliper disc brake which he installed on a 1941 Ford. At this time he was involved in design work for Goodyear Aircraft and he licensed Goodyear under all of his brake designs, other than those for aircraft, and sold the Ford automobile equipped with his disc brakes to Goodyear. There is a marked similarity both in design and function between the Hawley disc brake, the Dunlop '516 brake and the accused Kelsey-Hayes brake. In addition to the brake mounted on the 1941 Ford, Goodyear constructed at least three other disc brakes from the same basic design. One was installed on a radar trailer manufactured by Brooks and Perkins for Bell Telephone Laboratories; one was manufactured as a helicopter rotor brake and sold to Sikorsky Aircraft and one was installed by United Aircraft as a wind tunnel brake.

A number of witnesses testified concerning the Goodyear activity in non-aircraft disc brakes. These included employees of Goodyear during the period when the brakes were constructed and sold as well as employees of the purchasing companies. Detailed drawings of the original Hawley brake and the subsequently produced brakes embodying the same basic principles and design

were introduced along with several photographs. The secretary of Goodyear testified that in the late 1940's as assistant secretary he was involved in Goodyear's purchase of the Hawley 1941 Ford equipped with fixed caliper disc brakes. An engineering specialist with Goodyear testified that he was familiar with the first automotive disc brake built by Goodyear on the Hawley design. He testified that standard auto brake tests were conducted on the Ford equipped with these brakes and that it was taken to Sideling Hill, Pennsylvania and left for a week of tests. He further testified that the car was taken by Goodyear to Detroit in 1945 and left with Ford Motor Company for two or three days of testing. This witness stated that he drove the Ford equipped with the Hawley brakes many times, using it for routine transportation and that the brakes were quite satisfactory and he did not experience the "fade" of drum brakes. He testified that Goodyear kept the car for about three years before selling it and that it was used extensively and publicly in that time.

The former manager of the Wheel and Brake Division of Goodyear testified that he recalled the Hawley disc brake which was mounted on the 1941 Ford. He stated that this brake was demonstrated to at least four automobile manufacturers, none of whom was persuaded to switch to disc brakes. He testified that he thought the brake performed better than existing drum brakes, but that at the particular time (1946) there was such great demand for automobiles produced in Detroit that there was no inclination among the major manufacturers to make a change in basic equipment such as this. This witness described the Hawley brake in great detail and showed a familiarity with its design and operation. He introduced as an exhibit a report dated July 7, 1949 which was a résumé of the testing of Goodyear's single disc brakes on automobiles. This report described not only the original Hawley brake but several variations which were designed and constructed by

Goodyear and then tested on a fleet of cars at the Goodyear plant.

Another witness produced by Kelsey-Hayes was a former Goodyear engineer in charge of the development and test work on automotive disc brakes. In addition to identifying the Hawley disc brake and testifying that he drove the automobile equipped with this brake many times with satisfactory results, he also described improvements to the brake which were developed by Goodyear. He referred particularly to another fixed housing brake which was shown by pictures in the résumé previously referred to and which was mounted on a 1946 Ford. He testified that this was basically the same as the Hawley brake, with opposed pistons which moved laterally and fixed cylinders which were bolted to the housing or calipers. He stated that this brake unit was subjected to comprehensive tests on the 1940 Ford and that there were no difficulties in normal operations. On excessively rough roads, problems were experienced with this brake, but it was his opinion that this could have been corrected by rearranging the hydraulic system. The brake had an automatic adjusting feature which was not present in the original Hawley model. The witness also identified a set of brakes that was made for Brooks and Perkins Company of Detroit. These brakes were mounted on a radar trailer manufactured for Bell Telephone Laboratories. He stated that aside from the automatic adjuster it was a similar brake to the original Hawley brake. It had two pistons on each side of the disc compared to single pistons which were used on automobile brakes. He testified that the design work for the Brooks and Perkins brake was done in 1948 and that the brakes were produced in 1949. The trailer for which these brakes were manufactured was designed to carry electronic equipment used in the Nike missile program and was part of a government contract. The witness saw the brakes attached to the trailer, but did not know exactly how many sets of these brakes were actually sold. He said that he was the designer of the brake and that it was never patented.

Although there were indications that the Brooks and Perkins trailer was classified "restricted" by the military, the witness could not recall any particular security restrictions which were imposed while the brakes were being produced for the trailer. It was the opinion of at least one of the witnesses that only the electronic equipment was restricted and that this classification did not extend to such equipment as wheels and brakes on the trailer. In this connection, a question was raised about an outside shield which was installed around this brake and it was testified that the purpose of this shield was to protect the brake when the trailer was floated in water. One of the specifications for the trailer was that it was required to float for a certain period of time. A trial witness observed a test of the trailer in the Detroit River and stated that the shield performed well and that no water leaked into the brake assembly. Other former Goodyear employees identified detailed drawings of the Hawley-type brakes made for Sikorsky Aircraft for its helicopter rotors and one built for United Aircraft as a wind tunnel brake. Sales records were produced which authenticated the sales of these brakes by Goodyear.

■ Dunlop maintains that the Goodyear activity does not qualify, for a number of reasons, as prior art under 35 U.S.C. § 102. Instead, Dunlop would classify the Goodyear activity as "paper" prior art, which was never actually reduced to practice by successful testing. It hinges its entire case with respect to the validity of '516 on the proposition that the District Court erred as a matter of law in holding that the Goodyear uses invalidated this patent without a finding of fact that there had been an actual reduction to practice by successful testing. In National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224 (6th Cir.), cert. denied 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960), this

Court held that one claiming that a patent is void because it has been anticipated by prior art in the field carries a heavy burden and that proof of prior knowledge and use must be "clear and satisfactory." *Id.*, 274 F.2d at 231. The opinion emphasizes that prior art should be established by more than oral testimony and that reduction to practice is an essential if prior art is to be held to anticipate a patent. However, the case does not establish a requirement of *successful* testing as contended by Dunlop. The fact that a device has imperfections and encounters commercial problems does not disqualify it as anticipating prior art. While pointing out that a machine might qualify as prior art even though inoperative, the Court of Appeals for the Seventh Circuit stated: "So long as it embodies the same construction and principle as the alleged invention, a structure is effective as prior art even though the construction of the machine is crude, or the machine is imperfect in operation." Sutter Products v. Pettibone Mulliken Corp., 428 F. 2d 639, 647 (7th Cir. 1970).

 The requirement of 35 U.S.C. § 102(b) is that there has been a public use or sale of the invention in this country more than one year prior to the date of the patent application, and the alleged infringer must show this fact by clear and convincing evidence. Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., 409 F.2d 99 (6th Cir. 1969). A single public use or a mere placing of the invention on sale meets the requirements of the statute. In F. M. C. Corporation v. F. E. Myers & Bro. Co., 384 F.2d 4 (6th Cir. 1967), cert. denied 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968), "public use" was defined as "any nonsecret use of a completed and operative invention in its natural and intended way." 384 F.2d at 9. A prior use which is substantially for experimental purposes does not invalidate a later patent. Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., *supra*. A prior device need not be patented in order to anticipate, and if it has been re-

duced to practice, even though it is abandoned later, it may negative novelty in a subsequent patent. Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., 332 F.2d 406 (6th Cir.), cert. denied 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964). The statute speaks in terms of sales and use of the prior device and no testing requirement, as such, is listed. There was testimony that the original Hawley brake on the 1941 Ford was tested and similarly that some testing took place on the Hawley-type brake installed on the 1946 Ford by Goodyear and on the brakes built for Brooks and Perkins, Sikorsky and United Aircraft. A reading of Dunlop's brief reveals that the type of testing it maintains should be required is something comparable to the highway safety standards promulgated by the Department of Transportation. Such testing might well be required before any automobile part were mass produced and affixed to vehicles offered for sale to the public generally, but the requirement that prior art be reduced to practice does not entail this degree of perfection. The total effect of Dunlop's arguments with respect to the Goodyear evidence is that Goodyear engaged only in experimental work with fixed caliper automotive disc brakes and that there was no successful reduction to practice of this concept by Goodyear.

 Every patent issued by the United States Patent Office carries with it a presumption of validity. 35 U.S.C. § 282. However, where applicable prior art has not been considered by the Patent Office this presumption is greatly weakened. Aluminum Company of America v. Sperry Products, Inc., 285 F.2d 911 (6th Cir. 1960), cert. denied, 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87 (1961). In F. M. C. Corporation v. F. E. Myers & Bro. Co., *supra*, we held that when an alleged infringer makes a prima facie demonstration of prior use, the inventor then has the burden of proving that this use "was not of a functionally operative device, or was substantially used for experimentation or testing pur-

pose." 384 F.2d at 10. The evidence of the Goodyear activity in fixed caliper disc brakes was sufficient to make a prima facie case of anticipation by prior use. The evidence of Dunlop, to the contrary, fell short of that required to rebut this showing. The novelty required by 35 U.S.C. § 102(a) is lacking where there has been anticipation by an earlier device, whether patented or not, where all the elements of the patent, doing substantially the same work in the same way are found in a single prior art structure. A. J. Industries, Inc. v. Dayton Steel Foundry Co., 394 F.2d 357 (6th Cir. 1968). In his findings of fact with respect to the validity of '516 patent, Judge Pratt held that each of the four Hawley-type disc brakes manufactured by Goodyear was substantially identical to the claims of the '516 brake of Dunlop; that each of the brakes was sold and that each was successfully operated for a period of time. He also found that the use of the Goodyear brakes was public and that the brakes were not merely experimental but should more accurately be classified as "custom built." The Court also made a specific finding that the evidence of Goodyear disc brake activity was not considered by the Patent Office prior to the issuance of the '516 patent.

There was introduced into evidence a letter written on May 13, 1964 from the general manager of Dunlop's brake division to an attorney for Kelsey-Hayes. This was after Kelsey-Hayes had discovered the existence of the previous Goodyear activity and had determined to cancel its sublicense from Bendix and proceed with the production of fixed caliper disc brakes without royalty payments to Bendix or Dunlop. This letter indicated considerable doubt by Dunlop concerning the validity of the '516 patent but disclosed an intention to bring infringement actions for commercial advantage. The relevant portion of the letter is as follows:

"The reports from our attorneys are in fact very much as we expected them to be. Considerable doubt is expressed as to the validity of No. 2,-790,516 in view of the Goodyear disclosures. However, it also seems the case that most of the evidence on which an opponent might have to rely has been destroyed or is no longer available and whilst we think that we would be reluctant to litigate this patent we would not like you to assume that in no circumstances would we fail to do so. On the contrary it could well be of advantage to us, commercially, to start an action for infringement."

The findings of fact of the District Court with respect to the validity of the '516 patent are supported by competent evidence and are not clearly erroneous. Having found that the Goodyear devices constitute prior art and were known or used by others in this country, that the uses were public and not secret or purely experimental, the Court properly concluded that the claims of the '516 patent had been anticipated and that it was not a patentable invention under 35 U.S.C. § 102(a), (b) or (g). Our holding that the '516 patent is invalid dispenses with the need for consideration of the infringement issue. Felburn v. New York Central Railroad Co., 350 F.2d 416 (6th Cir. 1965), cert. denied, 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966); National Transformer Corp. v. France Mfg. Co., 215 F.2d 343 (6th Cir. 1954).

### The '650 Patent

As has been earlier pointed out, the '650 patent is also a fixed caliper, opposing piston disc brake. However, it was designed specifically for railroad cars and heavy industrial equipment. Claim 13 of the patent application deals with a feature for the removal of the friction pads. Since the entire controversy concerning the validity of the '650 patent revolves around Claim 13 it is set forth verbatim. Claim 13 of the '650 patent reads as follows:

"A disc brake comprising a rotatable disc; a pair of friction elements, one on each side of said disc and covering only a portion of the braking

surfaces of said disc, each of said elements having end portions transverse to the direction of movement of the disc and providing bearing surfaces on which said elements are slidably supported; a stationary torque-resisting member having at least three components holding said friction elements from movement in a plane parallel to said disc, and at least one of said components being displaceable to permit removal of said friction elements in a plane parallel to said disc and a pair of said components being held in axially spaced positions on each side of and closely spaced from said disc and having surfaces transverse to the direction of rotation of said disc and placed complementarily to the transverse end portions of said friction elements to guide said elements at their opposite ends in movement to and from said disc and to restrain said elements from circumferential movement parallel with said disc; and means to move said friction elements toward said disc, each of said friction elements being between said means and said disc."

Kelsey-Hayes bases its attack on the '650 patent in part on an assertion that the invention was not patentable because of obviousness under 35 U.S.C. § 103 and the claim that the specification of the patent does not comply with the requirements of 35 U.S.C. § 112. Section 103 provides as follows:

§ *103. Conditions for patentability; non-obvious subject matter*

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798.

The '650 brake provides a means for removing friction elements and replacing them. This is important because these friction pads wear out more quickly than the other components of the brake, and a quick and inexpensive method of replacing worn pads is a desirable feature of any disc brake. While this need was obvious, the method by which it was met in the '650 patent was not obvious within the meaning of § 103, and the District Court correctly held that it did not lack patentability for obviousness.

The more serious attack by Kelsey-Hayes on the '650 patent concerns the language of Claim 13 and the late filing of that Claim. Claim 13 was not added to Dunlop's application for the '650 patent until more than five years after the original application. Kelsey-Hayes asserts that the language of Claim 13 is purposely vague and indefinite in an attempt to cover brakes of other manufacturers already on the market. It particularly attacks the language of Claim 13 which refers to a ". . . stationary torque-resisting member having at least *three components* holding said friction elements from movement in a plane parallel to said disc, and at least one of said components being displaceable to permit removal of said friction elements in a plane parallel to said disc and a *pair of said components* being held in axially spaced positions on each side of and closely spaced from said disc. . . ." (emphasis added). It is claimed that the evidence at the trial showed that no pair of components is held in axially spaced positions on opposite sides of the disc and that the use of the word "components" was contrived to be broadly enough defined to cover dissimilar elements of other devices.

There was a great deal of discussion by the witnesses and attorneys of the meaning of the word "components" and whether it is synonymous with "elements." Kelsey-Hayes makes much of

the fact that the expert witness who testified for Dunlop designated four components whereas an answer to interrogatories and the file history of the patent identified three components. In upholding the validity of the '650 patent, the District Court decided this battle of semantics by finding that "the essence of the invention is the provision for a displaceable member which is a working portion of the caliper and is integral to the torque-taking function, but allows the removal of an end piece which does not disturb the power sides of the unit. . . ." The Court reached this conclusion by examining the language of the Claim itself. The Claim describes a stationary torque-resisting member having at least three components, at least one of which is displaceable to permit removal of the friction elements in a plane parallel to the disc and a pair of "said components" being held in axially spaced positions on each side of and closely spaced from the disc. The displaceable portion of the brake assembly is a component of the fixed housing. A comparison of this language with the specification and the preferred form leads to the conclusion that the only members which could provide the surfaces described in Claim 13 and perform the functions called for therein would be the limb portions of the two ends of the caliper, one of which is the displaceable end. This restrictive reading of the scope of Claim 13 also led the Court to the conclusion that the original disclosure of the application would permit the addition of Claim 13 as against the contention of Kelsey-Hayes that the patent is invalid under the "late claiming" doctrine. In Muncie Gear Works, Inc. v. Outboard Marine & Manufacturing Co., 315 U.S. 759, 62 S. Ct. 865, 86 L.Ed. 1171 (1942), the Supreme Court held that a late claim filed more than one year after public use of an invention does not invalidate the original application if it only clarifies matter sufficiently disclosed in the original application. As interpreted by the District Court Claim 13 related to matters fully disclosed in the original application. Coats Loaders & Stackers, Inc. v. Henderson, 233 F.2d 915, 924 (6th Cir. 1956).

■ The restrictive reading which the Court gave to Claim 13 compelled the further finding that the accused device of Kelsey-Hayes does not infringe '650. It is difficult to compare the two brakes since '650 was designed for railroad rolling stock and other heavy industrial uses and the accused brake of Kelsey-Hayes is a disc brake assembly for automobiles. Removal of the friction elements from the Kelsey-Hayes brake is accomplished in quite a different manner from that of the '650 brake. Rather than having a portion of one arm of the fixed caliper made displaceable for purposes of removing friction pads circumferentially, the Kelsey-Hayes brake is equipped with spring clips attached to the housing, and unscrewing these spring clips permits the friction pads to be withdrawn radially. Although Dunlop's expert witness attempted to find in the Kelsey-Hayes brake elements which correspond with each of the "components" set forth in Claim 13, certain important differences between the two devices could not be overlooked. A patent is infringed when a comparison between it and an accused device reveals that every element of the claim alleged to be infringed is found in the accused device and that both perform "substantially the same function in substantially the same way to obtain the same results. F. M. C. Corporation v. F. E. Myers & Bro. Co., *supra*, 384 F.2d at 14.

■ The District Court made the following four findings of fact with respect to infringement of the '650 patent, all of which are supported by competent evidence:

1. The accused brake method includes the displacement of two spring clips on top of the housing but not integral to the housing, which spring clips serve a torque-taking function in a radially outward direction, a minor, if not minimal, torque action created by the rotation of the disc.

2. The accused brake uses the ends of the caliper as guiding and torque-taking surfaces similar generally to the use of the ends of the '650 caliper.

3. The friction members of the accused brake have backing plates which are elongated and which have, on the top ends, ears which fit into and ride on ledges formed into the ends or bridge pieces of the caliper. The ears are held down by the spring clips which are attached to the caliper ends by screws.

4. The accused brake is entirely open on the top and the friction pads may be removed by unscrewing the spring clips from the caliper. The pads are thus removed radially and outwardly in a plane parallel to the disc.

In discussing the "distinctive contrasts" between the '650 brake and the accused Kelsey-Hayes device, the District Judge pinpointed the difference in the identity and function of the displaceable members of the two brakes in the following language: "Most importantly, in the '650 patent the removal requires the displacement of an integral end of the caliper, the predominant torque-taking device, whereas in the accused brake, removal requires the displacement of two spring clips which serve little torque-taking function. The clips are attached to, but not integral to the top of the caliper." We agree that this is a real distinction between the two brakes. Certainly the principal of a disc brake assembly having a displaceable member to provide for the removal of worn friction pads is not in itself patentable. Having necessarily confined itself to a particular application of this principle Dunlop cannot successfully claim infringement against a brake which achieves this result in a different manner.

We are not unaware of the fact that during the period of time that Kelsey-Hayes was a sublicensee of Bendix, the licensee of Dunlop, there was an exchange of information between Dunlop and Kelsey-Hayes relating to fixed caliper disc brakes for automobiles. Never-

theless, upon learning of the Goodyear activity, Kelsey-Hayes expressed its dissatisfaction with the sublicensing agreement a few days after it was signed. A period of time passed in which negotiations were carried on between Dunlop and Kelsey-Hayes looking toward a possible settlement of the dispute, but they were not succesful. Upon being advised by Dunlop during this period of time that it was sending certain information to Kelsey-Hayes which it considered confidential, Kelsey-Hayes immediately directed Dunlop not to send the material. The record indicates that both parties considered it to be advantageous to their interests to maintain close contact with each other during the period before the final break which led to this law suit.

The District Court correctly held that the '650 patent is valid and that Kelsey-Hayes has not been guilty of infringement with respect to it.

### The Kelsey-Hayes Cross-Appeal

Kelsey-Hayes sought treble damages for alleged violation of the antitrust laws of the United States in certain actions of Dunlop. It is alleged that various foreign licenses of Dunlop which forbid exportation of the Dunlop brakes from the foreign manufacturers to the United States constitute an illegal division of world markets. The case cited by Kelsey-Hayes, United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), is not in point. That case involved a horizontal agreement dividing markets within the United States. Dunlop's agreements with its licensees in Japan, Italy, Germany and Australia cannot be characterized as true horizontal agreements dividing markets. They are merely territorial licenses granted by a patentee such as are permitted by 35 U.S.C. § 261. If one who received a patent from the United States may so restrict his licenses without violating the domestic antitrust laws, it would seem clear that a patentee could do the same thing with foreign licenses without violating the antitrust laws of this country. Kelsey-

Hayes also cited Krampe v. Ideal Industries, Inc., 347 F.Supp. 1384 (N.D.Ill. 1972). In that case misuse of a patent was found to exist because the licensing agreement required the licensee to sell no other products which were similar or identical to the patented device. The fact that this prohibition might limit commerce in the patented device between Germany and the United States was a purely incidental consideration in the holding of the Court.

■■■ Referring to the letter from Dunlop management to Kelsey-Hayes counsel in which doubts were expressed about the validity of the '516 patent, Kelsey-Hayes alleged a misuse of the patent in Dunlop's efforts to license it after having doubts about its validity. It also claims that Dunlop, knowing the '516 patent was invalid, nevertheless attempted to persuade Kelsey-Hayes to pay royalties under the '516 patent in order to obtain a license to manufacture other Dunlop brakes in the United States. These charges of misuse of the patent are not supported by evidence of probative value, and the District Court correctly held that Kelsey-Hayes had not established misuse.

Other allegations of unclean hands were made by Kelsey-Hayes in support of its demand for attorneys' fees in this action. In his Memorandum, Judge Pratt noted that both sides indulged in innuendo and sought to create inferences of inequitable conduct by the other party. However, hard proof of any misconduct on the part of either plaintiff or defendant is lacking, and Kelsey-Hayes simply failed in its burden of proving the allegations.

Our conclusion from studying the entire record in this case, which record is lengthy and in many respects obfuscated, is that Judge Pratt displayed a clear understanding of the mechanical principles as well as the legal issues involved and that his findings and conclusions are correct.

The judgment of the District Court is affirmed.