**MILLER INSITUFORM, INC. and Thomas E. Smith**

v.

**INSITUFORM OF NORTH AMERICA, INC. and Jack Massar, and William C. and Ira B. Miller.**

No. 3–84–0972.

United States District Court, M.D. Tennessee, Nashville Division.

March 27, 1985.

Gail Pigg, Nashville, Tenn., for plaintiffs.

Robert J. Walker, Gayle Malone, Jr., Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, Chief Judge.

This case arises under the Sherman Antitrust Act and the Clayton Act, involving the alleged misuse of patent rights. Plaintiffs also seek pendent jurisdiction over state law claims for fraud and misrepresentation. Defendants have filed motions to dismiss and for summary judgment. Upon review of the facts and law of the case, the Court concludes that dismissal is appropriate as to certain claims, but that material issues of facts for adjudication are present with respect to others. The Court dismisses all claims made under Section 1 of the Sherman Act and the claim of an unlawful royalty formula. The Court denies the motion to dismiss claims alleging monopolization, attempt to monopolize, and an unlawful tie-in. The Court also denies the motion to dismiss the claims of fraud and misrepresentation.

### Facts

The dispute in this matter centers around a licensing scheme regulating the use of a process patent on technology developed for the rehabilitation of sewers and other similar passageways. The patent, U.S.Patent No. 4,064,211, protects the "Insituform Process," which consists of placing an absorbent liner in a passageway, impregnating the liner with a synthetic resin, and retaining the liner in place while the liner cures or is cured. Basically, the process permits a pipe or other passageway to be rehabilitated and/or strengthened, rather than having to be replaced.

The patent is owned by Insituform International, N.V., a Netherlands Antilles corporation. In June of 1980, Insituform International entered into a licensing agreement with Insituform of North America, Inc. (INA), a Delaware corporation, conveying to INA the exclusive right to practice

the patented process throughout the United States, except in California. Subsequently, INA granted exclusive subleases in various territories throughout the United States. On February 16, 1983, INA granted to Miller Insituform, Inc., an exclusive sublicense to practice the Insituform Process in Tennessee, Kentucky, and certain portions of Ohio.

The sublease agreement contains the following provisions which are material to this case:

1. Paragraph XII requires the sublicensee to maintain a net worth of at least $500,000.

2. Paragraph XIV(b) provides that INA may terminate the license agreement for failure of the sublicensee to perform any material term or condition of the contract, or if the sublicensee's net worth falls below $500,000.

3. Paragraph IX governs the formula for calculating royalties which the sublicensee is obligated to pay INA. The terms provide that sublicensees are to pay 8 percent of the gross contract price on all contracts using the Insituform Process. The royalty formula includes the costs incurred for preparatory and finishing work, labor, and materials. The royalty formula includes in its calculation costs that are not subject to the process patent itself.

4. Paragraph IV states that because the Insituform Process is highly technical, its success is dependent upon the use of quality materials that conform to exacting specifications. The contract permits Miller Insituform to purchase materials not covered by INA patents or copyrights from any source, but conditions their use on INA's approval.

At the time the sublicense agreement between INA and Miller Insituform was executed, William C. and Ira B. Miller were the sole shareholders of Miller Insituform. In September of 1983 the Millers sold 99 percent of their stock to the current individual plaintiff, Thomas E. Smith, a resident of Murfreesboro, Tennessee. Plaintiff Smith claims that at the time of the negotiations for sale of the Millers' stock, INA agreed to modify the sublicense agreement's requirement that Miller Insituform maintain a net worth of $500,000. Smith paid a total of $250,500 for the Millers' stock; $125,000 was paid in cash, with the balance secured by a note and the assignment of accounts payable.

Smith claims that in the early part of 1984, INA began to conspire with one of its corporate officers, Jack Massar, and other wholly-owned sublicensees, to take over the Miller Insituform's exclusive territory (Kentucky, Tennessee, and Southern Ohio).[1] On or about May 9, 1984, INA terminated the sublicense agreement with Miller Insituform. In a letter signed by Jack Massar, plaintiff Smith was advised that Miller Insituform had failed to provide a balance sheet showing a net worth of at least $500,000, as required under the terms of the license agreement, and, consequently, Miller Insituform was in breach of the agreement.

Plaintiff Smith, along with Miller Insituform, now bring suit under the Sherman and Clayton Acts alleging that INA and Jack Massar unlawfully suppressed competition and sought to monopolize the market for the Insituform Process. Count One of the complaint charges that under Section 1 of the Sherman Act, INA conspired with its officer, Jack Massar, and certain of its sublicensees to wrongfully terminate Miller Insituform. Plaintiff also claims that the initial contract between INA and Miller Insituform conveying an exclusive sublicensee territory was an allocation of markets in restraint of trade, and that the royalty formula on the patent rights constituted price fixing. Finally, the plaintiffs charge INA with creating an illegal tying arrangement with regard to the unpatented materials used in the Insituform Process.

Count Two of the complaint charges INA with the attempt to monopolize and the actual monopolization of the entire United

---

1. The Court construes plaintiffs' pleadings to state that the sublicensees with whom INA allegedly conspired were wholly owned subsidiaries of INA. *See* Complaint ¶ 11.

States market for the Insituform lining process, in violation of Section 2 of the Sherman Act. Plaintiffs claim that INA misused its patent license by implementing a royalty payment formula that required payments for work and materials not covered by the patent or copyright rights. Plaintiffs' complaint also charges INA with the use of a tying arrangement. Plaintiffs claim that although the contract provided that nonpatented commodities could be purchased from other vendors, in fact, INA was the only entity from which these materials could be purchased, and that INA wrongfully refused to sell Miller Insituform these necessary materials in its attempt to take over Miller Insituform's territory.[2]

Count Three of the complaint charges William and Ira Miller, the former stockholders of Miller Insituform, with fraud and misrepresentation in the sale of their stock interest to plaintiff Smith. Plaintiffs claim that because the original sublicensing agreement between INA and Miller Insituform violated the Sherman Act, the license agreement was void *ab initio*, and, accordingly, any representation by the Millers to Smith as to the value and validity of the license rights constituted a false and misleading representation.

### Law

Defendants INA and Jack Massar have filed a joint motion to dismiss under Fed.R. Civ.P. 12(b)(6) asserting that the plaintiffs have failed to state a claim on which relief can be granted. Similarly, William and Ira Miller have filed a motion to dismiss and/or for summary judgment. Because the issue as to the truth of the Millers' representations hinges upon the initial validity of the

---

**2.** Tying arrangements are expressly prohibited under Section 3 of the Clayton Act and, in the context of this case, may also constitute unlawful conduct under Section 2 of the Sherman Act to the extent that it aids in the unlawful extension of the scope of the lawful patent right.

**3.** Even if the antitrust laws do apply to the territorial restrictions in INA's patent licensing scheme, such vertical allocations of markets are

sublicense agreement, the Court will first consider the antitrust claims.

A two-step framework of analysis is necessary to evaluate the plaintiffs' claims under the Sherman Act. On the first level, the Court must look to the express terms of the sublicense contract to determine whether, on its face, the agreement is a contract "in restraint of trade" within the meaning of Section 1 of the Sherman Act, or unlawfully expands the scope of legitimate patent rights in violation of Section 2 of the Sherman Act. Secondly, the Court must review the operation of the sublicense agreement to determine whether in the course of performance the contract unreasonably restrains trade under Section 1 of the Sherman Act, violates the prohibitions on monopolization under Section 2 of the Sherman Act, or constitutes a proscribed practice under the Clayton Act.

**A.** *Analysis of the Express Terms of the Sublicense Contract*

**1.** *Validity of Territorial Restrictions in Patent Licensing Schemes*

■ In count one of the complaint, plaintiffs assert that the sublicense agreement between INA and Miller Insituform is void *ab initio* since the arrangement constitutes a *per se* unlawful division of territories under the Sherman Act.[3]

■ The Court will not review the reasonableness of INA's division of markets under its sublicensing scheme. The Court holds that, as a matter of law, a patent licensor's use of geographic restrictions in a sublicensing scheme to divide territories into ones of primary or exclusive jurisdiction constitutes a lawful application of the rights derived from a patent grant. Under Section 261 of the Patent Act, 35 U.S.C. § 261 (1976), a patentee may grant exclu-

---

not *per se* illegal, but are subject to scrutiny under the rule of reason. *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 54–59, 97 S.Ct. 2549, 2559–2562, 53 L.Ed.2d 568 (1977) (rule of reason is the proper standard of antitrust scrutiny for vertically-imposed divisions of territories since such restraints often generate pro-competitive interbrand rivalry).

sive territorial rights over any specified part of the United States. Relevant portions of Section 261 provide: "The applicant patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States." 35 U.S.C. § 261. Pursuant to the "inherency doctrine," Section 261 immunizes from antitrust analysis an allocation of territories created by a patentee's use of exclusive licenses. *Brownell v. Ketcham Wire & Mfg. Co.,* 211 F.2d 121, 128–29 (9th Cir. 1954); *United States v. Parker-Rust-Proof Co.,* 61 F.Supp. 805, 812–13 (E.D.Mich. 1945); *see also Dunlop Company Ltd. v. Kelsey-Hayes Co.,* 484 F.2d 407, 417 (6th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974); *The Attorney General's National Committee to Study the Antitrust Laws,* Department of Justice, at 237 (1955); ABA Antitrust Section, Monograph No. 6, *U.S. Antitrust Law in International Patent and Know-How Licensing,* 13–15 (1981) (hereinafter ABA Monograph); Garrett and Johnson, *Antitrust Aspects of Geographical Restrictions in Patent Licensing Arrangements,* in 123 PLI, *Patent Antitrust 1980,* at pp. 214–22. The immunity also extends to a patent licensee's division of its territory among its various sublicensees. *Id.*[4] A patentee has a legal monopoly which he may exploit to the bounds of his right,

*Ethyl Gasoline Corp. v. United States,* 309 U.S. 436, 456, 60 S.Ct. 618, 625, 84 L.Ed. 852 (1940), and accordingly, the patentee can convey exclusive rights to another, in whole or in part, and may give a licensee an exclusive right to manufacture, use or sell a patented product, or practice a patent process, in a particular zone or territory. *Pfizer, Inc. v. Heckler,* 735 F.2d 1502, 1512 (D.C.Cir.1984). In *Parker-Rust-Proof,* 61 F.Supp. at 812–13, the court recognized the right of a patentee to limit territories and the number of licensees who may practice the patent. The court held that a patentee may impose on its licensees any condition that does not unlawfully expand the scope of his patent monopoly. *Accord Dunlop Company, Ltd. v. Kelsey-Hayes Co.,* 484 F.2d at 417–18.

■ This Court adheres to the inherency doctrine, and holds that INA's initial grant of an exclusive territory to Miller Insituform does not violate federal antitrust law and is a valid exercise of patent rights authorized under the Patent Act, 35 U.S.C. § 261.

### 2. *Misuse of Patent Doctrine: Illegality of Restrictions that Expand the Scope of Patent Rights*

■ A restriction that goes beyond the scope of the patent is not authorized under the Patent Act and is not clothed with immunity from antitrust laws.[5] *Walker*

---

**4.** Although federal courts generally apply the same antitrust-law-immunity to licensing schemes as that afforded to outright grants of patent rights, a number of commentators have challenged the legal rationale for the practice. The basic position of these commentators is that while Section 261 of the Patent Code expressly exempts assignments from conflicting antitrust provisions, an exemption for licenses may only be implied. Lacking an express exemption, licensing schemes should be subject to rule of reason scrutiny under the antitrust laws. Baxter, *Legal Restrictions on Exploitation of the Patent Monopoly,* 76 Yale L.J. 267, 347–52 (1966); Gibbons, *Domestic Territorial Restrictions in Patent Transactions and the Antitrust Laws,* 34 Geo.Wash.L.Rev. 893, 894–904 (1966); Turner, *The Patent System and Competitive Policy,* 44 N.Y.U.L. Rev. 450, 469–470 (1969); Andewalt and Allen, *Patent Licensing and Immunity from*

*the Antitrust Law—The Government Prospective,* in 123 PLI, *Patent Antitrust 1980,* at pp. 273–284.

Form over substance will not control this Court's analysis. From a competition-oriented perspective, there is little difference between an assignment and a license of patent rights. The same pro-competition considerations apply when analyzing restrictions contained in the creation of both types of rights. Therefore, just as assignments enjoy immunity from antitrust scrutiny, licenses are similarly cloaked with such immunity. A license or a grant of patent rights is subject to antitrust scrutiny only upon a showing that the scheme unreasonably expands the scope of the legal monopoly granted by the federal government.

**5.** The types of practices constituting a misuse of patent monopoly power were reviewed in *Brownell v. Ketcham Wire & Mfg. Co.,* 211 F.2d 121, 128–129 (9th Cir.1954).

*Process Equipment, Inc. v. Food Machinery & Chemical Co.,* 382 U.S. 172, 175, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965); Bender, *Patent Misuse,* in 123 PLI, *Patent Antitrust 1980,* 67–94. Rather, such a restriction is subject to antitrust scrutiny to assess the restraint's competitive significance. *Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 491–92, 62 S.Ct. 402, 404–05, 86 L.Ed. 363 (1942) (refusing injunctive relief in an infringement suit in which patentee was shown to have established an illegal tie-in between its patented salt machine dispenser and nonpatented salt tablets).[6] In *Mercoid Corp. v. Mid-Continent Investment Co.,* 320 U.S. 661, 665, 64 S.Ct. 268, 271, 88 L.Ed. 376 (1944), the Supreme Court enunciated the *misuse of patent* doctrine:

> The grant of a patent is the grant of a special privilege "to promote the

progress of science and useful arts." Const. Art. I, § 8. It carries, of course, the right to be free from competition in the practice of the invention. But the limits of the patent are narrowly and strictly confined to the precise terms of the grant.

In *Preformed Line Products Co. v. Fanner Mfg. Co.,* 328 F.2d 265, 267–78 (6th Cir.1964), *cert. denied,* 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964), the Sixth Circuit Court of Appeals applied the doctrine to condemn both a tying and exclusive dealings arrangement contained within a patent licensing scheme. In this case, although the Court recognizes the validity of INA's initial allocation of an exclusive territory to Miller Insituform, it nevertheless must consider whether other terms of the contract and/or the contract's operation go

"It is not the monopoly of the patent that is invalid. It is the improper use of that monopoly." *U.S. v. Line Material Co.,* 333 U.S. 287, 310, 68 S.Ct. 550, 562, 92 L.Ed. 701 (1948). The courts have condemned many practices in connection with the use of patents, e.g.: (a) Use of invalid patents in price fixing: *McGregor v. Westinghouse Electric & Mfg. Co.,* 329 U.S. 402, 407, 67 S.Ct.421, [423] 91 L.Ed. 380 (1947).
(b) Cross-licensing of patents: *U.S. v. Line Material Co., supra.*
(c) Attempts to extend the scope of patent monopoly: *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 516, 37 S.Ct. 416, 61 L.Ed. 871 (1917); *Carbice Corp. of America v. American Patents Development Corp.,* 283 U.S. 27, 31, 51 S.Ct. 334, [335], 75 L.Ed. 819 (1931).
(d) Illegal price fixing activities in connection with patents: *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942); *Edward Katzinger Co. v. Chicago Metallic Mfg. Co.,* 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374 (1947); *McGregor v. Westinghouse Electric & Mfg. Co., supra, Pfotzer v. Aqua Systems, Inc.,* 162 F.2d 779, (2d Cir.1947), falls within this category. There was also involved the claim of royalties on unpatented articles.
(e) Tying patents to unpatented devices or processes: *Ethyl Gasoline Corp. v. U.S.,* 309 U.S. 436, 456, 60 S.Ct. 618, [625], 84 L.Ed. 852 (1940); *Mercoid Corp. v. Mid-Continent Investment Co.,* 320 U.S. 661, 667–668, 64 S.Ct. 268, [272], 88 L.Ed. 376 (1944); *Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.,* 320 U.S. 680, 684, 64 S.Ct. 278, [280], 88 L.Ed. 396 (1944).

(f) Seeking to extend the effect of an expired patent: *U.S. v. Timken Roller Bearing Co.,* 83 F.Supp. 284, 313–314 (D.Ohio 1949), *affirmed Timken Roller Bearing Co. v. U.S.,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).
(g) Misuse of patents: *U.S. v. National Lead Co.,* 932 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947); *McCullough v. Kammerer Corp.,* 166 F.2d 759 (9th Cir. 1948).

**6.** As the Department of Justice recently noted, the level of antitrust scrutiny of patent licensing schemes should not be as stringent as that imposed when evaluating restrictions which do not involve patents or other types of intellectual property.

> [R]estrictions in licenses of intellectual property (e.g., patent, a copyright, trade secret, and know-how) ... often are essential to ensure that new technology realizes its maximum legitimate return and benefits consumers as quickly and efficiently as possible.... Unless restrictions in intellectual property licenses involve naked restraints of trade unrelated to development of the intellectual property, or are used to coordinate a cartel among the owners of competing intellectual properties, the restrictions should not be condemned.

Department of Justice, *Vertical Restraints Guidelines,* 50 Fed.Reg. No. 31, 6263, 6266 (February 14, 1985) (concluding that promulgated guidelines are not applicable to patent licensing schemes in view of differing competitive considerations applicable to intellectual property from typical commodities and services).

beyond the lawful scope of the patent rights and suppress competition in violation of the antitrust laws.

### a. *Royalties*

■ The plaintiffs claim that the royalty formula requiring Miller Insituform to pay a fee of 8 percent of the total contract price constitutes an unreasonable abuse of INA's patent license rights. Plaintiffs object to the formula since it includes in its calculation the costs of preparatory and finishing work, labor, and nonpatented materials. Plaintiffs maintain that a fee structure that charges for any item other than those directly tied to the patented Insituform Process constitutes unlawful leverage of the patent rights. The Court disagrees.

■ Under the antitrust laws, the province of the federal courts is to protect competition, not the competitor. Hence, a Court ordinarily will not review the terms of a contract negotiated at arm's length. "A patent owner may exact royalties as high as he can negotiate with the leverage of that monopoly." *Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964); *but see American Photocopy Equipment v. Rovico, Inc.,* 359 F.2d 745, 747 (7th Cir.1966) (condemning 24 percent royalty fee on total sale price of a machine as "exorbitant and oppressive"). When reviewing INA's alleged abusive royalty formula, then, this Court will limit its consideration to whether the payment structure unreasonably suppresses competition in the patented process, furthers unlawful monopolization of a particular market, or somehow constitutes a proscribed practice under the various antitrust statutes. A claim of overreaching, unless clearly tied to unlawful federal antitrust conduct, raises an issue of state contract law not subject to independent federal review.

INA's royalty formula does not violate federal antitrust law. The payment schedule of 8 percent of the total contract is imposed on the single, unitary Insituform Process. The Process involves nonpatented preparatory and finishing stages and a patented "middle" stage, requiring the use of both patented and unpatented materials. The Court will not conduct a long and expensive inquiry to establish the relative value of each aspect of the entire rehabilitation procedure in the attempt to isolate out the appropriate value of the patented stages and materials. Indeed, since the engineering and technical requirements undoubtedly will differ in each particular application of the Insituform Process, the relation between the costs of the nonpatented and patented features of the Insituform process also must invariably differ from one job to the next. The Court will not formulate a substitute royalty formula for the one negotiated by the parties.

Further, the Court will not review the reasonableness of the royalty formula. The royalty formula in this case is distinguishable from the formula subjected to— and upheld under the reasonableness test in *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed.2d 1312 (1950). In *Automatic Radio,* Hazeltine Research, Inc. [HRI] conveyed to Automatic Radio the right to use all present and future HRI patents in consideration for a percentage-of-total-sales royalty. Automatic Radio sought to avoid the arrangement by arguing that the fee structure exacted royalties regardless of whether HRI patents were used in a particular radio. The Court concluded that the agreement represented "the most convenient method of fixing the business value of the privileges granted by the licensing agreement" since the formula avoided the need to determine whether each particular Automatic Radio model embodied HRI patents. 339 U.S. at 834, 70 S.Ct. at 898, The Supreme Court reached he opposite conclusion in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), in which the Court invalidated a formula that, like *Automatic Radio,* exacted a percentage-of-total-sales royalty. The difference in *Zenith Radio* from *Automatic Radio* was that in *Zenith Radio* the licensee had, from the outset, objected to the royalty formula, claiming

that many HRI patents were unsuitable for Zenith Radio applications and that, in fact, many of Zenith's products contained patents of competing patentees. HRI refused to license its patents without a percentage-of-total-sales royalty. The Court concluded that the percentage-of-total-sales royalty in *Zenith Radio* was not reasonable, nor the most convenient method for calculating a fee.

■■■ The Court in this case need not consider reasonableness or convenience of INA's royalty formula since the Insituform royalty is charged only on projects that utilize the patented process. No uncertainty exists as to which of the Miller Insituform projects utilize the Insituform Process; they all do. The concern both in *Automatic Radio* and *Zenith Radio* was that a royalty was charged on certain sales that contained no HRI patent whatsoever. Yet, in both cases, no question ever was raised as to the propriety of charging a percentage-of-sales royalty on those radios containing HRI patented parts, even though such radios may have also have contained other competing patented and nonpatented parts. Because INA's royalty fee is triggered only by the use of the Insituform Process, the Court declines to review the reasonableness of the fee under antitrust analysis. For this reason, the Court dismisses the plaintiffs' claims as they relate to royalties.

b. *Misrepresentation and Fraud*

■■■ The Court concludes that the sublicense agreement executed between INA and Miller Insituform is a valid contract which does not violate the antitrust laws. Accordingly, the Court finds that the contract was not void *ab initio* as is argued by the plaintiffs *vis-a-vis* the plaintiffs' claim of fraud and misrepresentation against the Millers in Court Three of the complaint. At the same time, the Court concludes that (as discussed below in Part B of the Memorandum) certain aspects of the operation of the agreement may violate federal antitrust laws and, therefore, material issues are presented as to possible representa-

tions made by the Millers to Smith concerning the INA/Miller Insituform commercial relationship. The Court denies the Millers' motion for dismissal and/or summary judgment. Fed.R.Civ.P. 56.

**B.** *Analysis of the Operation and Effect of the Sublicense Agreement*

Having analyzed the express terms of the sublicense agreement, the Court now considers the operation of the contract and those overt acts the plaintiffs claim violate federal antitrust law.

1. *Section One Claims Under the Sherman Act*

■■■ Plaintiffs charge that INA conspired and/or combined with Jack Massar and some of its wholly-owned sublicensees to terminate Miller Insituform's exclusive license rights in violation of Section 1 of the Sherman Act. Plaintiffs argue such conduct constitutes an unlawful allocation of territory, a concerted refusal to deal and price fixing. The Court finds, however, the pleadings do not allege the type of concerted action federal courts have interpreted as necessary to make out a *prima facie* case under Section 1. Plaintiffs' allegations object to conduct that represents unilateral activity under Section 1 of the Sherman Act and is therefore not actionable. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

■■■ To make out a cause of action under Section 1 of the Sherman Act, the plaintiffs must demonstrate a contract, combination or conspiracy in restraint of trade. 15 U.S.C. § 1 (1976). Two elements are necessary. *First,* the plaintiffs must satisfy what is commonly known as the "duality requirement." That is, at least two persons must have joined together in pursuit of a common scheme. *Second,* the plaintiffs must show that the particular scheme is "in restraint of trade." Federal courts have interpreted the proscription on concerted action "in restraint of trade" to apply only to those forms of commercial conduct that unreasonably suppress competition in the market place. In this case, the plaintiffs charge that INA conspired, either

with its employee Jack Massar or with its wholly-owned sublicensees to terminate Miller Insituform's license patent rights.

■ All claims against Jack Massar are dismissed for failure to state a claim on which relief can be granted. Fed.R.Civ.P. 12(b)(6). Plaintiffs charge that Jack Massar, as an officer of INA, conspired with his employer in violation of Section 1 of the Sherman Act. Well established precedent in the federal courts holds that collaborative efforts between a corporation and its employees is not sufficient to satisfy the duality requirement for proving a conspiracy within the meaning of 15 U.S.C. § 1. *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 893 (3d Cir.1981), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Nelson & Supply Co., Inc. v. Motorola,* 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953) (a corporate defendant is a legal "person" who can act only through its agents and officers). In *Copperweld Corp. v. Independence Tube Corp.,* — U.S. —, —, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628, 642 (1984), the Supreme Court stated that coordinated conduct between officers and employees of a corporation cannot constitute a conspiracy under Section 1 of the Sherman Act. There is no "sudden joining" of previously divergent interests in economic force and, therefore the officer's conduct does not threaten to reduce competition by removing independent decision making power in the market place. Rather, concerted effort by the officers of a corporation is necessary to effect efficient operation of the unitary interests of the employer corporation. *Id.; Schwimmer v. Sony Corp. of America,* 677 F.2d 946, 953 (2d Cir.1982), *cert. denied,* 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982); *Green v. Associated Milk Producers, Inc.,* 692 F.2d 1153, 1156–57 (8th Cir.1982).

■ Plaintiffs' allegation of a conspiracy between INA and its wholly-owned subsidiaries similarly fails to make a claim on which relief can be granted. In *Copperweld,* — U.S. at — – —, 104 S.Ct. at 2736–41, 81 L.Ed.2d at 637–42, the Supreme Court held that a parent corporation and its wholly-owned subsidiary are incapable of conspiring with each other for purposes of Section 1 of the Sherman Act. Because a parent and its wholly-owned subsidiary have a unitary economic interest, concerted action between the two does not pose the type of anticompetitive dangers the Sherman Act is designed to combat.

■ In sum, because the plaintiffs claim that INA conspired with its wholly-owned subsidiary sublicensees and with Jack Massar, the plaintiffs have failed to state a claim under Section 1 of the Sherman Act.

2. *Claims Under Section 2 of the Sherman Act: Attempt to Monopolize and Monopolization*

The Court now considered whether the operation of the sublicense agreement constitutes a misuse of patent rights under Section 2 of the Sherman Act or the Clayton Act. Plaintiffs charge that INA wrongfully terminated Miller Insituform's sublicense agreement on the pretext that the plaintiffs failed to provide a net worth statement demonstrating at least $500,000. Plaintiffs claim that this requirement previously was modified by INA during Smith's negotiation with the Millers concerning Smith's stock purchase and, therefore, no such contractual obligation existed at the time of termination. This then, is a question of fact for adjudication.

■ In order to make out a cause of action for attempt to monopolize, the plaintiff must demonstrate (1) that the defendant possessed an intent to monopolize and (2) there is a dangerous probability of success. *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). The question of a party's intent is peculiarly one of fact which must be determined at trial. Similarly, the question of the probability of success of an attempt to monopolize also gives rise to a question of fact for adjudication. In *Walker Process Equipment, Inc. v. Food Machinery*

*& Chemical Corp.,* 382 U.S. at 177–78, 86 S.Ct. at 350–51, the Supreme Court held that in order to establish monopolization or an attempt to monopolize, the plaintiff must establish the relative exclusionary power of the patent in terms of the relevant market for the product involved. This question, then, requires the Court to determine the relevant product market for the Insituform Process and whether there are effective noninfringing substitutes for the process within that market. The Insituform Process may not be the only alternative for rehabilitating pipes and sewers. Furthermore, in some situations, a sewer line may be so dilapidated that it is cheaper to replace the entire pipe than to rehabilitate it with the patented process. These are questions of fact that cannot be determined on a motion for dismissal.

### 3. *Tying Arrangements*

Plaintiffs also charge INA with creating a tying arrangement by which it has used its rights to the Insituform Process as leverage to require sublicensees to purchase from INA separate, unpatented materials (e.g., liners and resin) necessary to perform the Insituform Process. Plaintiffs assert that though the sublicense contract permitted Miller Insituform to purchase approved materials from any source, the nonpatented materials were, in fact, available only from INA, which wrongfully refused to sell Miller Insituform such products in furtherance of INA's plan to terminate the sublicensee's commercial activity. Defendants dispute this fact and claim the materials could be purchased from a number of suppliers. The relative availability of such materials presents a material issue of fact on the question of whether INA established an unlawful tying arrangement.

▆▆▆▆▆ Tying arrangements are prohibited under Section 3 of the Clayton Act and may also be attacked as a misuse of patent monopoly power under Section 2 of the

Sherman Act.[7] In order to demonstrate an unlawful tying arrangement, the plaintiff must show three elements: (1) the existence of two separate products; (2) the defendant possesses sufficient market power in the tying market; and (3) the tying arrangement has a substantial adverse effect on competition in the tied market. *Jefferson Parish Hospital District No. 2 v. Hyde,* —— U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545, (1958); *Aluminum Company of America v. Sperry Products, Inc.,* 285 F.2d 911, 926 (6th Cir. 1960), *cert. denied sub nom., Firestone v. Aluminum Company of America,* 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87 (1961); *Bell v. Cherokee Aviation Corp.,* 660 F.2d 1123, 1127 (6th Cir.1981). Conditioning the license of a patented process on the sublicensee's agreement to purchase separate, nonpatented goods can be both a tying arrangement and a misuse of a patent. *Preformed Line Products Co. v. Fanner Mfg. Co.,* 328 F.2d 265, 276–77 (6th Cir. 1964). However, a tie-in usually would not exist when a patentee (or its licensee) conditions the right to use his patented process upon the vendee's purchase of nonpatented commodities that are necessary to the process, if such commodities have no effective, noninfringing use other than application in the patented process. *See Dawson Chemical Co. v. Rohm & Haas Co.,* 448 U.S. 176, 213, 100 S.Ct. 2601, 2621, 65 L.Ed.2d 696 (1980) (under Section 271(3) of the Patent Act, 35 U.S.C. § 271(c), "Congress granted to patent holders a statutory right to control nonstaple goods that are capable only of infringing use in a patented invention, and that are essential to that invention's advance over prior art.").

▆▆▆▆ With respect to the tie-in claim, it is uncertain whether two separate products exist; that is, whether the nonpatented commodities are distinct from the technical

---

7. The Justice Department recently took the position that "[t]ying arrangements generally do not have significant anticompetitive potential," Justice Department Guidelines on Vertical Re-

straints, *supra,* at 6271, and that it would prosecute such arrangements only when certain specified conditions exist.

Insituform Process. Further, the Court must inquire into whether INA has sufficient economic power to restrain competition in the tied products or, on the other hand, whether INA is the only entity interested in manufacturing and/or supplying such materials. Finally, the Court must consider the alleged tie-in's effect on interstate commerce. These are material issues of fact for adjudication, warranting the Court's denial of the defendants' motion to dismiss on the tie-in claim.